**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

ISRAEL SCHVIMMER AND MIRIAM
SCHVIMMER, individually and f/o/b I.S. A
MINOR CHILD.

                           Plaintiffs,

      - against -

THE OFFICE OF COURT
ADMINISTRATION; <u>et al</u>.

                        Defendants

**CIVIL ACTION**
File No.: 18-7419

**1ST AMENDED COMPLAINT[1]**

**JURY DEMANDED**

## INTRODUCTION

1.  Plaintiffs Israel and Miriam Schvimmer bring this civil rights action seeking redress for the violation of their constitutional rights when agents of the New York Administration for Child Services ("ACS") in conjunction with other individuals seized and detained their children F.S. and I.S. without Plaintiffs' permission or the existence of any imminent risk to the children's life or health.  Simply put, there is not, and never has been, any danger to the health or safety of F.S. or I.S. in Plaintiffs' home, yet agents of ACS seized custody of their minor children without legal justification, and kept it.[2]  Defendant ACS and all of the individual named Defendants conspired to present false and fraudulent testimony at an initial state child neglect hearing, and, along with

---

[1]  This is the first substantive amendment to the complaint. A prior amended complaint filed by Plaintiffs *pro se* on January 4, 2019 was inaccurately titled and only restated the name of the John Doe Plaintiffs.

[2]  F.S. was initially seized, and I.S. somewhat later.  F.S. remained physically in ACS custody for the duration, but I.S. was "placed" with his parents after a short period of time and remained there although he was subject to ACS jurisdiction until the case was finally dismissed in November of 2019.

various officials of Defendant New York State Office of Court Administration ("OCA"), denied Plaintiffs the opportunity to present evidence at hearing on their own behalf for 40 months. Defendants further conspired to frustrate and impede Plaintiffs from pursuing appeals and other relief in state court.

2.   Defendants' actions, while nominally under the agency's child-protection mission, really form part of a larger conspiracy between the agency and private individuals involved with Family Court, the goal of which is to get undeserved money.  Money for the agency, money for the attorneys, money for the caseworkers and money for the guardians and therapists. This scheme involves taking unauthorized custody of vulnerable children and keeping them tied up in the system for as long as possible to maximize not just the agency's revenues, but also every other professional involved.  The rights of the child and the rights of the parents are dismissed or ignored.

3.   Plaintiff anticipates certain city actors will claim some form of qualified immunity, but that concept should not apply here to prevent scrutiny of the Defendants' actions which were transparently intended to support a sub rosa scheme ensuring that the Plaintiffs would never see their children again.  There was never a predicate finding that the child(ren) were abused or neglected, and Plaintiffs had an absolute right to the custody of their daughter and son.  Rather than comply with  Supreme Court orders to produce the child, Defendants conspired to steal the child.  Defendants could have produced F.S., but instead lied about her whereabouts, and failed to show up.  Defendants' actions were taken completely outside the scope of any legitimate duties, and thus should not qualify for qualified immunity.[3]

---

[3]  Qualified and absolute immunity should not permit a scheme of the nature here that drags out for years without any finding of abuse or neglect until the child "ages out" of the system.  Qualified immunity should not likewise not permit an Article 10 fact-finding hearing to be conducted simultaneously with a covert permanency planning hearing whose pre-ordained goal is to adopt the child out.

4.  Plaintiffs seek damages for themselves and on behalf of their minor son for denial of their right of access to the courts under the 1st amendment, right to procedural and substantive due process of law under the 5th and 14th Amendments, right to be free from unreasonable search and seizure under the 4th Amendment, conspiracy to violate their constitutional rights, RICO violations, and state law tort for infliction of emotional distress.

## SUMMARY

5.  On February 1, 2017, Plaintiffs' daughter F.S., then age 14, disappeared on her way to school and was subsequently found at the home of a relative who refused to return her to her parents.

6.  A subsequent two-week investigation initiated by Defendant ACS revealed that the child was not at imminent risk to her life or health in her parents' household.

7.  Nevertheless, in explicit defiance of a Writ of Habeas Corpus issued by the Supreme Court for Kings County, commanding that the child be produced for return to the parents, ACS seized and interviewed the child without obtaining the Plaintiffs' permission.

8.  Agents of Defendant ACS, in cooperation and conspiracy with other individuals, arranged to secrete and withhold F.S. from her parents during this period, at one point physically restraining her in a bathroom.

9.  Defendant ACS refused to return the child to the Plaintiffs.

10. Instead, Defendant ACS conspired with individuals working in Defendant OCA and other individuals connected to the family court to frustrate and bypass the Supreme Court orders.

11. Using fabricated and coerced evidence, Defendant ACS, in cooperation with Defendant Jacobs and Defendant Katz, filed a neglect and abuse petition and obtained a temporary order of

3

protection under Article 10 by which it wrongfully obtained temporary custody of both F.S. and her brother I.S.

12. At no time were the Plaintiffs found to be unfit parents, nor was their household found to present an imminent danger to either child's life or health.

13. Both I.S. and F.S. remained from that day in the custody of Defendant ACS and separated from their parents and family for up to 40 months.

14. Defendant ACS continuously stonewalled Plaintiffs' subsequent efforts to secure a full hearing at which to testify and present evidence that they were good parents and reunited with their children.

15. Defendant ACS renewed its temporary order of protection *nineteen times* in order to avoid a final hearing where it could be ordered to release the children to their parents.

16. After the filing of this present lawsuit, Defendant ACS eventually relented and released I.S. but continued to restrain F.S. and purposefully did not release her until after she turned eighteen in May of 2020 and the court lost jurisdiction.

17. During this entire period, Defendant ACS never afforded the Plaintiffs the opportunity to produce their evidence and witnesses regarding their fitness and the wrongful detention of their children.

18. During this same period, Defendants conspired to frustrate Plaintiffs' efforts to appeal the temporary orders by intimidating their filing efforts and sidelining their appeals in the clerk's office until they became moot.

19. The net result of this course of ACS conduct is that F.S. never returned home and Plaintiffs' relationship with their now-adult daughter is so damaged, that they were not able to fully participate in her wedding recently held.

20. Defendants' seizure and interviewing of Plaintiffs' children without a finding of imminent risk violated the rights of both Plaintiffs and their minor children under the Fourth Amendment to the United States Constitution prohibiting unreasonable searches and seizures and denied them procedural due process of law under the 5th and 14th Amendments.

21. Defendants' seizure and continued detention of Plaintiff's children denied the Plaintiffs substantive due process of law pursuant to the 14th Amendment protecting the right of their family to remain together.

22. Defendants' failure to permit Plaintiffs an opportunity at an evidentiary hearing to produce evidence on their own behalf denied them procedural due process of law pursuant to the 14th Amendment.

23. Defendants' frustration of Plaintiffs' efforts to appeal and seek other substantive relief denied them the right of access to the court under the 1st Amendment.

24. Defendants' frustration of Plaintiffs' efforts to seek other relief in the New York Supreme Court and appeal the temporary orders of protection issued in the Article 10 proceeding denied the Plaintiffs' their right of access to the courts under the 1st Amendment.

25. As a result of Defendant ACS' illegal and unconstitutional acts in seizing and restraining their children, the Plaintiffs and their family suffered incredible emotional and physical harm, and monetary damages for the enormous cost and expense of pursuing their children through the family court for nearly four years, for which Plaintiffs seek recompense from Defendants.

PLAINTIFFS

26. Israel Schvimmer, whose mailing address is 96 Skillman Street, Unit #11, Brooklyn, New York 11205 is a United States citizen and a resident of New York City, Kings County, State of New York.

27. Miriam Schvimmer, whose mailing address at 96 Skillman Street, Unit #11, Brooklyn, New York 11205 is a United States citizen and a resident of New York City, Kings County, State of New York, and the wife of Israel Schvimmer.

28. Israel Schvimmer and Miriam Schvimmer are the legal and natural parents of seven children, including F.S. (born 2002) and I.S. (born 2006), both minors at the time this case was originally filed. Since then, F.S. has turned eighteen and aged out of the Family Court system.

29. Israel Schvimmer and Miriam Schvimmer bring this lawsuit individually, and also on behalf of their minor son I.S., who also is a United States citizen and a resident of New York City, Kings County, State of New York.

### DEFENDANTS

30. ROD RANDALL was at all relevant times a clerk employed by the New York Office of Court Administration, an agency of the New York Unified Court System ("OCA"), in the office of the New York Supreme Court located at 360 Adams Street, Brooklyn, NY 11201. Defendant owed Plaintiffs a duty by virtue of his position as a clerk of court and to extend to them the same services as any other citizen. Defendant Randall is sued individually for his role and willful participation in a conspiracy to deny Plaintiffs their civil rights. On information and belief, to be further developed through discovery, Defendant Randall harbors personal animosity toward individuals who practice Hasidic Judaism. Defendant was at all times hereunder acting under color of state law in his role as a clerk of the NY Supreme Court.

31. JOYCE C. HOPKINS was at all times employed by OCA as the Assistant Deputy Clerk of the New York Kings County Family Court, located at 330 Jay Street, Brooklyn, NY, 11201. Defendant Hopkins is sued individually for her role and willful participation in a conspiracy to deny Plaintiffs their civil rights. Defendant owed Plaintiffs a duty by virtue of her position as a

clerk of court and to extend to them the same services as any other citizen.  On information and belief, to be further developed through discovery, Defendant Hopkins harbors personal animosity toward individuals who practice Hasidic Judaism.  Defendant was at all times hereunder acting under color of state law in her role as Assistant Deputy Clerk of the New York Kings County Family Court.

32. JOHN COAKLEY was at all times employed by OCA as the Deputy Clerk of Court of the New York Kings County Family Court, located at 330 Jay Street, Brooklyn, NY, 11201. Defendant Coakley is sued individually for his role and willful participation in a conspiracy to deny Plaintiffs their civil rights.  Defendant owed Plaintiffs a duty by virtue of his position as a clerk of court and to extend to them the same services as any other citizen.  Defendant was at all times hereunder acting under color of state law in his role as Deputy Clerk of the New York Kings County Family Court.

33. REBECCA SZEWCZUK was at all relevant times a Special Assistant employed with the New York City Office of the Corporation Counsel at 330 Jay Street, 12th Flr, Brooklyn, New York, 11201, and attorney for ACS, at 150 Williams Street, 4th Floor, New York New York, 10038.  Defendant Szewczuk is sued individually and in her capacity as attorney for ACS. Defendant Szewczuk owed Plaintiffs a duty by virtue of her status as a licensed attorney for Defendant ACS and the rules governing the practice of law in the state of New York.  Defendant Szewczuk has a personal financial interest in taking action in furtherance of agency goals. Defendant was at all times hereunder acting under color of state law.

34. JOHN ANTHONY MORGANO was at all relevant times an attorney for ACS, whose main office is located at 150 Williams Street, floor, New York, NY 10038.  Defendant Szewczuk owed Plaintiffs a duty by virtue of her status as a licensed attorney for Defendant ACS and the

rules governing the practice of law in the state of New York.  Defendant Morgano has a personal financial interest in taking action in furtherance of agency goals.  Defendant Morgano is sued individually and in his capacity as attorney for Defendant ACS.  Defendant was at all times hereunder acting under color of state law.

35. IAN SANGENITO was at all relevant times an attorney for ACS, whose main office is located at 150 Williams Street, floor, New York, NY 10038.  Defendant Sangenito owed Plaintiffs a duty by virtue of her status as a licensed attorney for ACS and the rules governing the practice of law in the state of New York.  Defendant Sangenito has a personal financial interest in taking action in furtherance of agency goals.  Defendant Sangenito is sued individually and in his capacity as attorney for ACS. Defendant was at all times hereunder acting under color of state law.

36. SALLY SIMONE MARKOWITZ was at all relevant times a private attorney and, since her appointment, the Law Guardian for F.S. in Article 10  proceedings involving F.S., and located at 26 Court Street, Brooklyn, NY 11242, Suite 901. Defendant Markowitz is sued individually.  Defendant was at all times hereunder acting under color of state law.  Defendant was compensated for the time she spent as Law Guardian and was motivated to prolong the court proceedings in order to maximize her income.  Defendant took actions described herein beyond the legitimate scope of her role as a Law Guardian appointed by the court.

37. BILLA TESSLER BENDET was at all relevant times a therapist to F.S. and located at 1255 East 31st Street, Brooklyn, New York 11210.  Defendant Bendet receives compensation for acting as appointed therapist to children involved in Article 10 child abuse and neglect proceedings, and injected herself into proceedings involving F.S. On information and belief, to be further developed through discovery in order to obtain personal financial benefit and was at

8

all relevant periods motivated to prolong F.S. in the custody of Defendant ACS to preserve Defendant Bendet's personal income stream.  Defendant Bendet is sued in her individual capacity.  Defendant was at all times hereunder acting under color of state law.

38. GWERNEN BUCKNER was at all relevant times a police office employed by Defendant New York City in the 79th Precinct, located at 263 Tompkins Avenue, Brooklyn, NY 11216. Defendant Buckner met and agreed to participate in the conduct and furtherance of the conspiracy to unlawfully seize and restrain F.S. and prevent her from being returned to her parents, as described in this complaint.  Defendant Buckner is sued in his individual capacity. Defendant Buckner was at all times hereunder acting under color of state law.

39. HARVEY JACOBS was at all relevant times a private attorney representing a third party Sarah Rosenfeld, and is located at 26 Court Street, Brooklyn, New York, 11242.  Defendant Jacobs regularly appears for clients in Article 10 neglect and abuse proceedings, and has an indirect financial relationship with ACS inasmuch as he personally benefits financially from being employed by third parties in prolonged Article 10 proceedings.  On information and belief, to be further developed through discovery, Defendant Jacobs for his own financial benefit and to fulfill the goals of  his client reached agreement to cooperate and take action with Defendant ACS to file and maintain a false Article 10 proceeding involving F.S. and I.S. and to prevent them from returning to their parents and remain in the custody of Defendant ACS for the longest time possible.  On information and belief, to be further developed through discovery, Defendant Jacobs was engaged by his client to file an adoption petition for F.S. well before any final decision in the abuse/neglect proceeding.  The adoption covertly paralleled the neglect and abuse proceeding strongly suggesting a foregone conclusion among the Defendants that the child

would be adopted out.  Defendant Jacobs is sued in his individual capacity.  Defendant was at all times hereunder acting under color of state law.

40. RABBI AZRIEL JUDA KATZ located at 407 Marcy Avenue #4-A, Brooklyn, NY 11206 is sued in his individual capacity.  Defendant Katz holds himself out as an official or unofficial "liaison" between the Hasidic Jewish community and Defendant ACS and able to influence their conduct in child abuse and neglect proceedings, and on information and belief, to be further developed through discovery, receives considerable compensation for his conduct in that role, and thus has a personal financial interest in remaining involved in ongoing Article 10 child abuse and neglect cases.  Defendant was at all times hereunder acting under color of state law.

41. CITY OF NEW YORK (NYC) is a municipality located within the State of New York. New York operates by and through administrative agencies including the New York Administration for Children's Services.   NYC was at all relevant times acting through Defendant ACS and was responsible for the appointment, training, supervision, discipline and retention and conduct of all Defendant ACS personnel, and for ensuring that Defendant ACS personnel obey the laws of the United States and the State of New York.

42. NEW YORK ADMINISTRATION FOR CHILDREN'S SERVICES (ACS) is a municipal agency of defendant NYC charged, *inter alia*, with protecting and promoting the safety and well-being of children and families.  Defendant ACS receives state and federal funding, reportedly between $4,000 and $6,000, in connection with each child that it removes from a home based on allegations of abuse or neglect and maintains in its custodial control. Defendant ACS depends upon this income to employ thousands of individuals whose paychecks in turn depend in large part upon seeing that Defendant ACS has children in its custody justifying its state and federal funding.  Defendant ACS is therefore financially motivated to

10

seize and retain custody of children for as long as possible.   Defendant ACS acts at all times, and in particular during and in connection with the events described in this complaint, under color of state law and regulation.  At all relevant times, Defendant ACS acted by and through its employees, officers, attorneys and agents including Defendants Szewczuk, Morgano, Sangenito, Hansell, Semexant, McNeely, Cyrus, Drayton, and Best. As an agency of Defendant NYC, all references to liability of Defendant ACS shall mean the liability of Defendant NYC.

43. DAVID HANSELL is an individual who is or was employed as the commissioner of defendant ACS.  Defendant Hansel is sued in his individual capacity and official capacity as the commissioner of ACS located at 150 Williams Street, 4th Floor, New York, NY 10038.  At all times hereunder, Defendant Hansell was responsible for training and supervising the conduct of the employees of ACS, and ensuring compliance with the statutes, regulations and rules applicable to the agency.  On information and belief to be developed in discovery, Defendant Hansell was aware of the conspiracies described in this complaint that deprived Plaintiffs of their constitutional rights and to seize and hold Plaintiffs' children unlawfully in ACS custody and was in a position to take and by reasonable action could have restore Plaintiffs' children to their custody and prevented further violation of Plaintiffs' constitutional rights. Defendant was at all times hereunder acting under color of state law.

44. SYNDIA SEMEXANT was at all relevant times a caseworker employed by Defendant ACS, located at 150 Williams Street, 4th Floor, New York NY 10038.  Defendant Semexant is sued in her individual capacity and official capacity as an ACS caseworker. Defendant Semexant was at all times acting with the knowledge and under the direction of her supervisor Defendant Adejobi.  Defendant was at all times hereunder acting under color of state law.

11

45. KATHY ANN BEST was at all relevant times a caseworker for Defendant ACS located at 150 Williams Street, 4th Floor, New York NY 10038.  Best is sued in her individual capacity and official capacity as an ACS caseworker. Defendant was at all times hereunder acting under color of state law.

46. CARMALITA CYRUS was at all relevant times a supervisor for Defendant ACS located at 150 Williams Street, 4th Floor, New York NY 10038.  Cyrus is sued in her individual capacity and official capacity as an ACS caseworker.  Defendant Cyrus was at all times acting with the knowledge and under the direction of her supervisor Defendant Francis.  Defendant was at all times hereunder acting under color of state law.

47. KAREN MCNEELY was at all relevant times a caseworker for Defendant ACS located at 150 Williams Street, 4th Floor, New York NY 10038.  McNeely is sued in her individual capacity and official capacity as an ACS caseworker.  Defendant was at all times hereunder acting under color of state law.

48. BEVERLY DRAYTON was at all relevant times a caseworker for Defendant ACS located at 150 Williams Street, 4th Floor, New York NY 10038.  Drayton is sued in her individual capacity and official capacity as an ACS caseworker.  Defendant was at all times hereunder acting under color of state law.

49. AIRAT BAKARA ADEJOBI was at all relevant times a supervisor for Defendant ACS located at 150 Williams Street, 4th floor, NewYork, NY 10038.  Defendant Adejobi is sued individually and in her official capacity as an ACS supervisor.  During all relevant times, Defendant Adejobi had knowledge of and supervised the actions of Defendant Semexant. Defendant was at all times hereunder acting under color of state law.

12

50. CECILY FRANCIS was at all relevant times a supervisor for Defendant ACS located at 150 Williams Street, 4th floor, NewYork, NY 10038.  Defendant Francis is sued individually and in her official capacity as an ACS supervisor.  During all relevant times, Defendant Francis had knowledge of and supervised the actions of Defendant Cyrus.  Defendant was at all times hereunder acting under color of state law.

51. WANDA FRASER was at all relevant times a caseworker employed by Defendant ACS located at 150 Williams Street, 4th floor, NewYork, NY 10038.  Defendant Fraser is sued individually and in her official capacity as an ACS caseworker.  Defendant was at all times hereunder acting under color of state law.

52. CHRISTINE AKA LOTTIE HENDERSON was at all relevant times a supervisor for Defendant ACS located at 150 Williams Street, 4th floor, NewYork, NY 10038.  Defendant Henderson is sued individually and in her official capacity as an ACS supervisor.  During all relevant times, Defendant Henderson had knowledge of and supervised the actions of Defendant Fraser.  Defendant was at all times hereunder acting under color of state law.

53. PETER HILL was at all relevant times a licensed clinical social worker employed with Defendant ACS located at 5858 Catalpa Avenue, Ridgewood, NY 11385.  Hill is sued in his individual capacity.  Defendant was at all times hereunder acting under color of state law.

54. NICHOLAS SMITH was at all relevant times a licensed clinical social worker, and his present address is unknown and will be developed through discovery. Defendant Smith is sued in his individual capacity. Defendant was at all times hereunder acting under color of state law.

55. JOHN DOE was at all relevant times an individual employed in some capacity by the New York Office of Court Administration.  John Doe is sued in his individual capacity with

13

respect to actions taken in his role with OCA.  Defendant was at all times hereunder acting under color of state law.

56. JANE DOE was at all relevant times an individual employed in some capacity by the New York Office of Court Administration.  Jane Doe is sued in her individual capacity with respect to actions taken in her role with OCA.  Defendant was at all times hereunder acting under color of state law.

57. At all times relevant hereunder, Defendants Hansell, Semexant, the ACS Employees, Szewczuk, Morgano, and Sangenito, and other agents of ACS involved in the events herein described, acted pursuant to the policies, regulation, or decisions officially adopted or promulgated by those in the Administration for Childrens Services that may fairly be said to represent official policy or were pursuant to governmental custom of the Administration for Childrens Services.

58. Each Defendant had full knowledge of the wrongs conspired to be done as alluded to in 42 U.S.C. § 1983 & U.S.C. § 1985, or knowing of the wrongs about to committed and having the power to prevent or aid in preventing the same, but neglected or refused to do that which by a reasonable and diligent person would have prevented.

59. At all times relevant hereto, all Defendants have acted under color of authority of the law of New York, or in active concert with such defendants who were so acting.

JURISDICTION AND VENUE

60. This Court has subject matter jurisdiction under 28 U.S.C. §1331 wherein the case involves matters arising under the First, Fourth, Fifth, Ninth and Fourteenth Amendments to the United States Constitution. (FEDERAL QUESTION)

61. This Court has supplemental subject matter jurisdiction over certain additional state law claims under 28 U.S.C. § 1367. (SUPPLEMENTAL STATE CLAIMS)

62. The Court has subject matter jurisdiction over this case wherein the claims are in connection with a wrongful deprivation of civil rights under 28 U.S.C. § 1343. (FEDERAL QUESTION)

63. This Court has subject matter jurisdiction over this case under 42 U.S.C. § 1983 and 42 U.S.C. § 1985 wherein it involves a wrongful conspiracy and acts to deprive Plaintiffs and their minor children of their civil rights. (CONSPIRACY TO DENY CIVIL RIGHTS)

64. This Court has original jurisdiction under 28 U.S.C. § 1343. (CIVIL RIGHTS).

65. Jurisdiction is also invoked pursuant to 18 U.S.C. §§1961-68 (RICO), 18 U.S.C. §1951 (Extortion by force, violence and fear), 8 U.S.C. §§ 1341 (mail fraud and other frauds and swindles) and 1343 (wire and other electronic fraud).

66. Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b) and (c) because the events at issue took place in that district and the majority of the parties can be found in that district.

67. Notice of the Plaintiffs Claim and Notice of Intention To Sue for Damages for violation of civil rights, negligence in hiring and retaining, negligence in performance and negligence in training and supervising, the nature of the claim and the date, the place where and the manner in which the claim arose was duly served upon the defendant by Color of Law Violation on or about the 27th day of July, 2018.

68. That since the Violation Notice has been served upon the defendants and the said defendants have neglected, refused or failed to make any changes in their actions thereof.

15

69. That this action is commenced within the time limit to file and that at the time of filing of original complaint said violations were ongoing.

70. Defendants' actions described in this complaint were of a continuing nature, commencing with the initial seizure of F.S. in or about February 2, 2017, and continuing unbroken up to the dismissal of the underlying Article 10 child abuse and neglect case in May of 2020 as the result of F.S. reaching the age of majority.

## ACS POLICIES AND PROCEDURES

71. As an administrative agency, Defendant ACS has adopted and implemented formal policies and procedures that relate to claims of child abuse or neglect.

72. On information and belief, to be further developed through discovery, ACS policies and procedures address among other things:

    a. the conduct of investigations,

    b. evaluation of whether abuse or neglect is occurring, and when temporary or permanent removal should be made,

    c. when and under what conditions removed children should visit with their parents, and

    d. conditions justifying the filing of a removal petition in Family Court.

73. Defendant Hansell is responsible for establishing ACS policies and procedures.

74. Defendant Hansell is responsible to ensure that all ACS employees and representatives are informed, trained, and adequately supervised in the implementation of the foregoing policies and procedures.

75. On information and belief, to be further developed through discovery, in order to ensure that Defendant ACS is well-funded, the agency has also adopted an unofficial but accepted and well-established policy, pattern or practice, and custom of seizing children without

16

parental consent under questionable or insufficient legal justification and maintaining them in the custody of the agency, against return to the family despite their fitness, for as long as possible.

76. On information and belief, to be further developed through discovery, Defendant ACS has a companion unofficial but adopted policy of ignoring its own existing rules concerning investigations, submitting manufactured evidence, suppressing truthful evidence, intimidating witnesses to testify falsely, and denying parents the ability to submit evidence in Article 10 proceedings in order to delay and thwart lawful efforts to release children from the custody of the agency.

77. On information and belief, to be further developed through discovery, Defendant ACS has an additional unofficial but adopted policy of targeting and discriminating against parents who are Hasidic Jews and removing their children upon slight provocation that is a lesser standard than is applied to children whose parents are not Hasidic Jews.

78. On information and belief, to be further developed through discovery, Defendant ACS and Defendant Hansell are fully aware that these unofficial policies exist and exceed the agency's legitimate authority and violate the constitutional rights of parents and children but have nonetheless caused them to be issued and employed and have maintained these unconstitutional policies, practices and customs for years.

FACTS

DISAPPEARANCE OF A CHILD

79. Plaintiffs Miriam and Israel Schvimmer were married in September of 1986, and together raised seven children.

80. When the parties filed for divorce on or about July of 2016, two children remained at home, F.S. (age 14) and I.S. (age 9).

17

81.     Shortly thereafter the parties resolved their issues and remained husband and wife.

82.     However, during this period they permitted F. S. to stay with her uncle while they worked to reconcile.

83.     On February 1, 2017, F.S. left her uncle's home to walk to school, but did not return.

INVESTIGATION AND REMOVAL

84.     When F.S. did not return home, Plaintiffs first tried to reach her by cell phone, and when that failed, they sought police assistance to find and return their daughter and filed a missing persons complaint.

85.     While Plaintiffs were actively searching for their daughter, they obtained an order from Judge Thomas of the New York Supreme Court on or about February 2, 2017 for any police or peace officers to assist bringing F.S. home.

86.     A copy of the order was provided to Defendant Buckner, and the same day he spoke with Defendant Semexant.

87.     On information and belief to be developed in discovery, Defendant Buckner learned from Defendant Semexant that F.S. was being held at non-party Rosenfeld's house at the direction of agents of Defendant ACS, but Defendant Bucker failed to return F.S. to her parents.

88.     Shortly thereafter, Defendant ACS, acting on an alleged "anonymous" undisclosed tip, undertook a two-week investigation of F.S. and her circumstances.[4]

89.     This investigation itself was unsupportable, as the child had remained with her uncle since the agency had last found no dangers.

---

[4] At the time this "new" investigation began, ACS had already recently completed an investigation of Plaintiffs' children and their household in connection with the divorce, and had found no danger or unfitness.

18

90.     Defendant ACS located F.S. at the home of a relative, Sarah Rosenfeld.

91.     However, Defendant Francis falsely recorded in her notes that F.S. resided with Sara Stern.

92.     Article 10 of the New York statutes authorizes family courts to issue preliminary orders directing the temporary removal of a child in true emergencies; i.e., if a parent refuses to consent, there is not time to file a petition, the child appears to suffer from abuse or neglect by the parent, and removal is necessary to avoid imminent danger to the child's life or health. N.Y.S.  § 1022.

93.     Defendant ACS did not seek or secure the consent of the parents (Plaintiffs) prior to detaining and interviewing F.S.

94.     Defendant ACS had sufficient time to apply for a court order under N.Y.S. § 1022 prior to detaining and interviewing F.S. but failed to do so.

95.     Despite the absence of parental consent or a court order, ACS caseworker Defendant Semexant, with the knowledge and under the supervision of Defendant Adejobi, along with Defendants McNeely, Cyrus, Drayton, and Best (the "ACS Employees") detained and interviewed F.S.[5]

96.     After speaking with multiple people including both Plaintiffs, Defendant ACS determined internally that no imminent risk to the child's life or health existed in her parents' household and that the Plaintiffs were fit parents.

97.     Despite that, Defendant ACS did not relinquish custody of F.S or return her to the Plaintiffs, but temporarily placed her at the Rosenfeld home.

---

[5] Dedendant Cyrus was acting with the knowledge of and under the supervision of Defendant Francis.

98.    Defendant ACS, through its agents, concealed this information from the Plaintiffs and lied to them about the child's whereabouts to avoid relinquishing custody to Plaintiffs.

99.    Under the impression that their daughter was still a missing person, the Plaintiffs sought and on February 10, 2017, obtained a writ of habeas corpus from Judge Thomas in the Supreme Court for Kings County compelling the return of their daughter.

100.    Defendant Buckner told Judge Thomas that day that he did not know F.S.' whereabouts.

101.    On information and belief, to be further developed in discovery, Defendant Buckner knew that F.S. was then held by Defendant ACS at Rosenfeld's and falsely stated that he had no such knowledge,  Shortly thereafter he closed the missing persons complaint.

102.    The writ was provided to Defendants ACS and ACS agents, but Defendant ACS still did not return F.S. to her parents. The writ was also provided to Defendant Buckner but he also failed to return F.S. to her parents.

103.    Unbeknownst to Plaintiffs, by this time Rosenfeld had met with Defendant Katz and secured attorney and Defendant Harvey Jacobs to represent her, and on information and belief both Katz and Jacobs had been in touch with Defendants ACS, Semexant, and the ACS Employees, about placing the child with Rosenfeld.

104.    In fact, Defendant Jacobs called Plaintiffs' attorney to notify her that while Plaintiff was in court for the writ, all of the parties named in the writ were gathered in his office.

105.    The writ was served on Defendant Bendet, however she failed to produce the child, but instead she took action on information and belief to prevent F.S. from returning to her parents, including the making of false and unsupported recommendations to Defendant ACS.

106.    Defendant Bendet attempted to coerce the Plaintiffs into surrendering control of their daughter's custody through use of a written "contract".  Bendet threatened the Plaintiffs that her daughter would not be coming home unless they signed to yield their parental rights.

107.    Defendant Bendet's action was outside her role as a court-appointed therapist.

108.    On information and belief, a copy of the writ was provided to  Defendant Markowitz, who knew where the child was located, however she failed to produce the child to the New York Supreme Court despite being a licensed attorney.

109.    At this point, the Defendants had full foreknowledge that there was an outstanding writ of habeas corpus from Judge Thomas of the New York Supreme Court commanding that the child be produced to the Plaintiffs, and that Defendant ACS had already found that there was no risk of  harm in Plaintiffs' home, and that the parents had not consented to removal to the custody of Defendant ACS.

110.    On information and belief, to be further developed through discovery, Defendant ACS, through Defendant Semexant, Adejobi, Francis, Fraser and the ACS Employees, thereafter secretly met and reached agreement with Defendants Jacobs, Katz, Markowitz and Bendet to frustrate, delay and thwart the Supreme Court writ, and prevent the child's return to her parents and keep her in Defendant ACS custody, by diverting the case into an improper Article 10 abuse and neglect proceeding in Family Court.

111.    It is not coincidental that the Defendants arranged to have an Article 10 proceeding commence the day after the writ of habeas issued from the New York Supreme Court.

112.    The decision was based upon a desire by Defendant ACS to keep unauthorized and legally unjustified custody of the vulnerable child for as long as possible to maximize its

21

revenues, upon the self-interested motives of the non-ACS parties in receiving revenue for their parts as attorneys, guardians, and allied professionals in the illegal plan, and upon the fact that Plaintiffs and their daughter were practicing Hasidic Jews who traditionally preferred to keep such matters within in their own community.

113.    On information and belief, to be further developed through discovery, Defendants Semexant, Adejobi, Francis, Fraser and the other ACS Employees met and reached agreement with Defendants Jacobs, Katz, Hill, Smith, Bendet and Markowitz to provide false and misleading testimony and opinions in support of an Article 10 petition seeking to permanently remove F.S. and I.S. from the Plaintiffs so that ACS, and each of them, could receive a handsome stream of income from doing so.

114.    Defendants' actions are best understood in the context of the larger conspiracy of ACS and its agents, including Semexant, Adejobi, Francis, Fraser and the ACS Employees, with private actors to keep the ACS machine well-fed with vulnerable children to maximize its federal and state revenues.  On information and belief, to be further developed in discovery, ACS identified these Hasidic Jewish children as vulnerable targets because they know that there are customs and mores within that community that make it less likely for them to seriously challenge Defendant ACS actions than other groups.

115.    Defendant ACS depends upon the willing participation of allied professionals and private actors who all have a personal financial interest in supporting Defendant ACS to keep children in its custody due to the stream of personal income they receive from being part of it, such as therapists, guardians, and attorneys.

116.    Thus, Defendants Jacobs, Katz, Hill, Smith, Bendet and Markowitz all stood to profit by Defendant ACS' efforts to  hold these children in its custody for as long as possible.

22

117.    On information and belief, to be further developed through discovery Defendant Hill prepared and provided false and fraudulent observations and recommendations to Defendant ACS in support of its decision to seek permanent removal of F.S. from her parents despite knowing that the child was not at risk and that the Plaintiffs were fit parents.

118.    Without having ever having spoken with Plaintiff Miriam Schvimmer, Defendant Smith provided to Defendant ACS false statements claiming Defendant Miriam Schwimmer had a pattern of dysfunctional relationships.

119.    After the Plaintiffs refused to sign Defendant Bendet's "contract" yielding their parental rights, Defendant Jacobs took action to evade and effectively block the Supreme Court orders.

120.    On information and belief, to be further developed through discovery, Defendant Jacobs and Defendant ACS and other Defendants met and discussed F.S. with Defendants Randall, Hopkins and Coakley about participating in the effort.

121.    On information and belief, to be further developed through discovery, Defendants John Doe and Jane Doe, who worked in the OCA office, also participated in the diversion effort.

122.    On information and belief, to be further developed through discovery, Defendants Hopkins, Coakley and John and Jane Doe assisted Defendants Jacobs and Szewczuk to "judge shop" through four successive judges and steer the case to a family court judge they felt would be most receptive to their improper claims.[6]

---

[6] With due respect for the bench and judicial immunity, Plaintiffs have not named Judge Gruebel or her law clerk Lesley Johnsson as a party or co-conspirator despite the judge-shopping that occurred, Judge Greubel's knowledge of the Supreme Court writ, and her admission in open court on April 25, 2017 that the Supreme Court had greater jurisdiction and that she had overstepped her bounds when she ordered the child not to appear before Judge Thomas. The court appears to have played along with the Defendants' scheme, which would have been ultra vires the proper legal system. Further discovery into the case may inform the question of whether it is necessary to add Judge Gruebel as a party, and Plaintiffs reserve the

23

123.    During this time, Defendant ACS, in conjunction with Defendant Jacobs and non-party Rosenfeld, continued to hide F.S. from her parents, at one point physically restraining her in a bathroom.

124.    Defendant Jacobs and Defendant Katz met with the Plaintiffs and threatened that if they did not release F.S. to the custody of Defendant ACS and Rosenfeld, Defendants would see that I.S. was also taken by ACS.

125.    Plaintiffs rejected the extortionate demand.

ABUSIVE FAMILY COURT PROCEEDINGS

126.    On or about February 14, 2017, Defendant ACS sought a temporary court order of protection under Article 10 to remove F.S. from custody of her parents.

127.    The proceeding was initiated and maintained by Defendants Szewczuk and Morgano appearing as attorneys for Defendant ACS.

128.    On information and belief, to be further developed through discovery, Defendants ACS, Szewczuk, and Morgano were fully aware that ACS had previously concluded that there was no neglect or abuse in the Plaintiffs' household, but knowingly presented false and fraudulent information and fabricated testimony to the Article 10 court to present a false appearance of grounds to remove the children.

129.    The preparation, filing and maintenance of false Article 10 petitions, and the presentation of fabricated and false testimony and evidence, is not within the scope of legitimate duties of Defendants Szewczuk or Morgano as ACS or prosecuting attorneys.

---

right to do so in response to anticipated motions to dismiss.  Plaintiffs anticipate that discovery will document all of these actions.

130.    On information and belief, to be further developed through discovery, during those hearings each of Defendants Szewczuk and Morgano, despite appearing as counsel for ACS, testified as fact witnesses to false information concerning F.S. in an effort to secure an unlawful removal order.

131.    During the Article 10 proceedings both Defendants Jacob and Morgano engaged in ex-parte communications with the court, on information and belief to be further developed through discovery discussing with the court substantive case issues in a bold attempt to prejudice the court and further impede Plaintiffs' right to present evidence and secure reunification with their children.

132.    Engaging in prohibited ex-parte communications is not a task within the legitimate scope of an attorney's duties and prohibited under the rules of professional conduct applicable to the practice of law.

133.    On information and belief, to be further developed through discovery, Defendants Markowitz and Bendet each provided false and fictitious testimony in the Article 10 proceedings in support of the effort to secure an unlawful removal order.

134.    The presentation and offering of false testimony in an  Article 10 proceeding in order to secure a stream of agency income and/or to receive a personal stream of income are not actions within the scope of legitimate duties of Defendant Markowitz as an appointed Law Guardian or within the scope of legitimate duties of Defendant Bendet as a court-appointed therapist.

135.    During this period, Defendant ACS also sought and obtained a temporary order of protection to remove I.S. from his parents without their consent or legal justification.

136.    On information and belief, to be further developed through discovery, intentional frustration of and noncompliance with legitimate orders issued by the New York Supreme Court affecting the custody of children is an unofficial but pervasive custom and policy of Defendant ACS known to, approved by, and implemented by Defendant Hansell, Semexant and the other ACS Employees.

137.    At the Article 10 temporary hearing the court made no finding that Plaintiffs were unfit parents, or that their household represented an imminent danger to either child's life or health.

138.    Nevertheless, F.S. and I.S. were still not permitted to return to her parents while Defendant ACS conducted additional supposed investigation.

139.    In reality, the additional investigation was merely a stalling tactic to avoid conclusion of the hearing and return of the children.

140.    F.S. remained since that day in the custody of Defendant ACS and completely isolated from their parents and family, while I.S. remained under ACS jurisdiction.

141.    New York law requires that following the temporary removal of a child, a fact-finding hearing be held at which to present evidence concerning whether the child is abused or neglected.  See N.Y.S. §§ 1044, 1046.

142.    Plaintiffs repeatedly requested an opportunity to present their evidence that they were good parents and their home was safe, including factual and expert testimony, but were continually stonewalled by Defendant ACS which obstreperously adjourned every single subsequent proceeding on the basis that more "fact finding" was needed.

143.    At no time did Defendant ACS insist that the hearing be brought to conclusion or that Plaintiffs be given their chance to present evidence and testify.

144.    Defendant ACS, and on information and belief, to be further developed through discovery Defendants Szewczuk, Morgano, Sangenito, Hopkins and Coakley assisted in the charade by withholding notice from Plaintiffs of subsequent proceedings, thereby intentionally excluding Plaintiffs from the courtroom.

145.    On occasion Plaintiffs would only learn of proceedings when they were already in the courthouse for other reasons.

146.    Under ruse of the need for additional and never-ending "fact finding," Defendant ACS sought and obtained a series of repeated "temporary" orders of protection, none of which included any finding that the children were at imminent risk of harm in their parents' household.

147.    In reality this was a ploy by Defendant ACS and its agents to illegitimately retain temporary custody of the Schvimmer children by indefinitely delaying Plaintiffs' evidence and the conclusion of a final hearing at which Defendant ACS might be ordered to release the children back to the Plaintiffs.

148.    On information and belief, to be further developed through discovery, the retention of allegedly neglected and abused children in its custody for as long as possible to maximize agency funding is unofficial but pervasive custom and policy of Defendant ACS known to, approved by, and implemented by Defendant Hansell, Semexant and the other ACS Employees.

149.    Over the next forty months Defendant ACS renewed its "temporary" order of protection a total of nineteen times, thereby keeping the children in its custody and destroying the family unit.

150.    In this fashion Defendant ACS imprisoned the children, refusing to release them to their parents for nearly four years.

151.    It was not until Plaintiffs filed and pursued this federal lawsuit that Defendant ACS finally relented and released I.S.

152.    Even then Defendant ACS continued inexplicably to restrain F.S. despite the complete absence of any findings of abuse and neglect.

153.    During this period Defendants attempted to further drive a wedge between F.S. and her parents.[7]

154.    While Judge Greubel had issued an order for reunification efforts as early as October of 2017, the assigned caseworker, Defendant Fraser, failed to comply with the reunification order.  Instead she contacted the Defendant Katz, the "unofficial liaison" to the Hasidic Jewish community, on a number of occasions between December 2017 and May of 2018 and on information and belief discussed permanent custody in ACS and a possible adoption by Rosenfeld in the simultaneous adoption proceedings brought by her attorney, Defendant Jacobs.[8]

155.    At about this time, Defendant Katz made an unsolicited offer to Plaintiff Miriam Katz that he could make this "go away" if she gave him $40,00.00.  Plaintiffs viewed this as tantamount to an offer to pay a bribe, and refused.

156.    The Article 10 case drug on for nearly four years, and ACS did not finally release F.S. until she turned eighteen in May of 2020 and the agency lost jurisdiction.

157.    The state Article 10 proceedings have since been dismissed due to the passage of time and the emancipation of the child and are no longer pending.

---

[7] During this period Defendants Fraser and Flax also terrorized the child I.S. by showing up unannounced at the home and demanding to see him as if to take him away.  On one such occasion she forced him to disrobe in front of  her in complete disregard of his cultural sensitivities. The child suffered severe fear and anxiety around these "visits" and would try to hide when he heard a knock on the door.

[8] Although he held no "official" position with ACS, Rabbit Katz held himself out to be the unofficial liaison between ACS and the Hasidic Jewish Community and professed to have influence and persuasion with the agency, for which services he received compensation.

158.    No final custody order ever issued in the Article 10 proceeding.

159.    In all that time, Defendant ACS never afforded the Plaintiffs an opportunity to produce their evidence and witnesses regarding their fitness and the wrongful detention of their children, and a final fact-finding was never concluded.

160.    Without a final evidentiary decision, Plaintiffs could neither secure release of their children, nor file to appeal a final decision.

## PROBLEMS IN COURT ADMINISTRATION

161.    Thwarted by the Plaintiffs from securing a decision in the ongoing Article 10 proceedings, the Plaintiffs sought mandamus relief in the New York Supreme Court, and filed to appeal the temporary orders of protection in the New York Supreme Court Appellate Division.

162.    The receiving and processing of filings in the court clerk's office is a ministerial task, and not subject to discretionary or judicial decision-making.

163.    Plaintiffs' filings complied with all the processes and procedures established by the Office of Court Administration, the New York Supreme Court, and the Family Court.

164.    On information and belief, to be further developed through discovery Defendants ACS (through Semexant and the ACS Employees), Jacobs, Szewczuk, Morgano, and Sangenito conspired and entered into an agreement with Defendants Randall, Hopkins, Coakley and John and Jane Doe to block the Plaintiffs' efforts to secure relief in separate proceedings in the New York Supreme Court, or in the Appellate Division.

165.    On information and belief, to be further developed through discovery, Defendants Szewczuk, Morgano and Sangenito took action outside their prosecutorial roles to encourage Defendants Randall, Hopkins, Coakley and John and Jane Doe to act in furtherance of the conspiracy.

166.    However, when Plaintiffs sought to file for appeal or mandamus in the clerk's office, they were met with intense hostility by Defendants Randall, Hopkins and Coakley and John and Jane Doe, who worked with each other to frustrate the progress of Plaintiffs' action.

167.    Defendant Randall treated Plaintiffs dismissively, and responded derisively to their inquiries, "first of all, you didn't speak to me.  Second of all, I don't have to tell you anything".

168.    On several occasions, Defendant Randall forced Plaintiffs to physically wait for over six hours before he would accept their papers for filing in the active case.

169.    Defendant Randall misled Plaintiffs that their pending Supreme Court habeas case had "transferred out of here over to Family Court.  So you got a lot of issues with this case."

170.    Defendants Coakley and Hopkins intentionally forced Plaintiffs to wait for excessively long times before they would accept Plaintiffs' appeal filings.

171.    Defendant Hopkins called security guards to surround Plaintiff Miriam Schvimmer and intimidate her right in the filing room.

172.    Defendant Hopkins instructed her staff to lock the doors and have Plaintiff Miriam Schvimmer wait in the hall for hours.

173.    Defendant Coakley publicly announced "that Jewish woman is coming here again, let's make her wait," and then refused for extended periods to provide the documents Plaintiff Miriam Schvimmer requested.

174.    Defendant Hopkins told Plaintiff Miriam "who do you think you are?  A dirty Jew and will never get to see your kid back home".

175.    On a number of other occasions, Defendants Hopkins, Randall, Coakley and John and Jane Doe completely refused to accept Plaintiffs' papers for filing with the Clerk of Court.

176. As a result of the failure of Defendants Randall, Hopkins, Coakley and John and Jane Doe to  perform their ministerial tasks to accept and process the Plaintiff's filings, Plaintiffs' appeal papers languished in the clerk's office for weeks and were not transmitted to the Appellate Division until it was too late for them to be timely considered.

177. As a result of Defendants failure to perform their ministerial tasks, before an appeal decision could be obtained each temporary order would expire and the appeal dismissed as "moot".

178. As a result of the failure of Defendants Randall, Hopkins, Coakley and John and Jane Doe to  perform their ministerial tasks to accept and process the Plaintiff's filings, Plaintiffs' were denied (i) the right to obtain state appellate review, and  (ii) the right to request assistance of the New York Supreme Court by mandamus or other direct action, both without recourse.

179. Defendants' hostility and refusals to process Plaintiffs' filings were due to their animus against Plaintiffs' faith and heritage, as well as their participation in the conspiracy to unlawfully keep Plaintiffs' children in Defendant ACS custody.

180. Insulting, intimidating and thwarting Plaintiffs from filing and obtaining documents in the court clerk's office is not within the scope of duties of Defendants Randall, Hopkins and Coakley or Defendants John and Jane Doe within their roles as agents of the Office of Court Administration and Family Court.

181. Defendants' seizure and detention of Plaintiffs' children without a finding of imminent risk violated the rights of both Plaintiffs and their minor son under the 4th Amendment to the United States Constitution prohibiting unreasonable searches and seizures.

182.     Defendant's seizure and continued detention of Plaintiff's children without legal justification or parental consent denied the Plaintiffs substantive due process of law protecting the right of their family to remain together.

183.     Defendant's thirty-six-month failure to afford Plaintiffs an opportunity to produce evidence on their own behalf denied them procedural due process of law pursuant to the 14th Amendment.

184.     Defendants' failure to timely process and consider Plaintiffs' appeals prior to the temporary orders expiring, and then denying them as moot, also denied Plaintiffs procedural due process of law under the 14th Amendment.

185.     As a result of Defendant ACS' illegal and unconstitutional acts in seizing and restraining their children, the Plaintiffs and their family suffered incredible emotional, physical, financial and other harm, for which Plaintiffs seek recompense from Defendants.

COUNT ONE

42 U.S.C. § 1983

4th Amendment

Unreasonable Search and Seizure

186.     It is firmly established that "[p]arents . . . have a constitutionally protected liberty interest in the care, custody and management of their children." *Tenenbaum v. Williams*, 193 F.3d at 593 (2d. Cir 1999)  "[C]hildren have a parallel constitutionally protected liberty interest in not being dislocated from the emotional attachments that derive from the intimacy of daily family association." *Kia P. v. McIntyre*, 235 F.3d 749, 759 (2d Cir.2000)  Thus, the state's removal of a child gives rise to a variety of constitutional claims.

32

187.     The Second Circuit holds that a 4th Amendment claim may exist where state agents seize and interview children over their parents' objection.  See *Southerland v. City of New York*, 680 F.3d 127, 143 (2d Cir. 2012) Only in emergency circumstances where a child is immediately threatened with harm may a state official take even temporary custody of a child without parental consent or a court order.  *Tenenbaum v. Williams*, 193 F.3d 581, 602 (2d Cir. 1999) Parents are entitled to assert such claims on behalf of their children.  *Southerland, supra*, at 143.

188.     On information and belief, to be further developed through discovery, in or about February of 2017 Defendant ACS, through its agent Defendant Semexant, undertook to investigate an anonymous complaint that F.S. was in danger.

189.     Although she had knowledge that Plaintiffs were seeking their daughter's whereabouts, Semexant, acting in conjunction with Defendant Harvey Jacobs, hid F.S. from the Plaintiffs and restrained her from returning home to her parents.

190.     Defendants Karen McNeely, Carmalita Cyrus, Beverly Drayton, Kathy Ann Best, and Peter Hill each joined Semexant and participated during this period in the investigation of F.S., including interviews of witnesses and third parties and providing opinions in Defendant ACS meetings and recording false and fraudulent notes concerning the Plaintiffs' household.

191.     Each of the ACS Employees were aware that Plaintiffs were seeking their daughter, and each of them helped to conceal the imprisoned child and prevent her return to her parents.

192.     Defendant Semexant and the ACS Employees continued their initial investigation of F.S. for a period of two weeks.

193.     On information and belief, to be further developed through discovery Defendant Semexant conferred and consulted with the other ACS Employees concerning F.S., and with their approval and advice on or about February 3, 2017, seized and interviewed F.S.

194.     The circumstances at the time did not justify a pre-petition removal.

195.     Defendants ACS, Semexant and the ACS Employees did not obtain the consent of the Plaintiffs prior to restraining and interviewing their daughter F.S.

196.     Defendants ACS, Semexant, and the ACS Employees had sufficient time to seek a court order prior to seizing and interviewing F.S. but failed to do so.

197.     On information and belief, to be further developed through discovery, the interview failed to disclose any immediate threat of harm to F.S. in her parents' home.

198.     After completing her investigation, Semexant and the other ACS Employees concluded that the child was not at imminent risk of harm and that the Plaintiffs were fit parents.

199.     At no time did Semexant or the ACS Employees conclude that the Plaintiffs were negligent or abusive to F.S.

200.     Nevertheless, despite their knowledge that the circumstances did not justify pre-petition removal, Semexant and the ACS Employees failed to release F.S. or return her to the custody of the Plaintiffs.

201.     On or about February 7, 2017, Defendants ACS, Semexant, and Cyrus were all emailed a copy of the Writ of Habeas Corpus to produce the child in the Supreme Court of New York on February 10, 2017.

202.     Ignoring the writ, Defendants ACS, Semexant, and Cyrus all failed to produce the child, and refused to release F.S. to the Plaintiffs or even disclose her whereabouts.

203.     A second writ to produce the child was issued out of the Supreme Court on February 10, 2017, and served on Defendants Peter Hill, Kathy Ann Best, Beverly Drayton and Carmalita Cyrus.

204.     Although he was aware of the child's whereabout from Defendant Semexant, Defendant Buckner told the judge that he had no knowledge and failed to produce the child.

205.     Ignoring the second writ, the Defendants Hill, Best, Drayton and Cyrus failed to produce the child and refused to release F.S. to the Plaintiffs or disclose her whereabout.

206.     Although he was aware of the second writ to produce the child, and knew her whereabouts, Defendant Buckner failed and refused to return F.S. to her parents.

207.     At various times, the investigation was joined by other ACS agents, including Defendants Adejobi, Francis, Henderson and Fraser.

208.     Defendants Adejobi, Francis, Henderson, and Fraser refused to initiate efforts to reunify the family, despite a written order from Judge Greubel to do so.

209.     The conduct of Defendants ACS, Semexant, Buckner, Adejobi, Francis, Henderson and Fraser, and the ACS Employees, performed intentionally or with deliberate indifference and callous disregard of the Plaintiffs' rights, in seizing, interviewing and restraining F.S. without a court order, her parents' permission or the existence of immediately threatened harm, deprived Plaintiffs of their right to be free of unreasonable searches and seizures in violation of the Fourth and Fourteenth Amendments to the Constitution of the United States and 42 U.S.C. § 1983.

210.     The Plaintiffs suffered grievous physical and emotional injury, embarrassment, financial damages, and pain and suffering to themselves and their family as a result of being

denied their constitutional rights and forcibly separated from their daughter for which the Defendants should be made to pay damages.

211.    The Defendants conduct described above and in the facts of this complaint was the cause in fact and the proximate cause of the Plaintiffs' injury.

212.    WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, for:

   a.  $240,000,000.00 in compensatory damages;
   b.  $240,000,000.00 in punitive damages;
   c.  Reasonable attorney fees, if any;
   d.  Costs of suit;
   e.  Interest;
   f.  Any other and further relief that the Court may deem just and proper.

COUNT TWO

42 U.S.C. § 1983

Due Process of Law

Procedural Due Process

213.    Except where emergency circumstances exist' a parent cannot be deprived of the custody of his or her child` without due process, generally in the form of a pre-deprivation hearing.  *Southerland, supra*, at 142

214.    On or about February 7, 2017, Judge Thomas issued a Writ of Habeas Corpus out of the Supreme Court of New York commanding that F.S. be produced in her courtroom on February 10, 2017.

36

215.     The writ was served on Defendants ACS, Semexant and the ACS Employees, who by that time had already conducted an investigation disclosing that the child had not been abused or neglected while in the custody of her parents, and finding the parents to be fit.

216.     On information and belief to be developed in discovery, Defendant Adejobi was informed of the writ by  Defendant Semexant.

217.     Blatantly ignoring the writ, Defendants ACS, Semexant, Adejobi and the ACS Employees failed to appear before Judge Thomas and failed to produce F.S. to Judge Thomas, and continued to restrain her in the custody of Defendant ACS.

218.     A copy of the writ was provided to Defendant Buckner.

219.     Defendants ACS, Semexant, Adejobi, Szewczuk, Morgano, Buckner and the ACS Employees thereafter consulted and conspired with each other and with Defendant Harvey Jacobs and Defendant Katz and concocted a plan to avoid the writ of habeas corpus by filing a fictitious petition under New York Article 10 falsely alleging that F.S. was neglected or abused.

220.     On information and belief, to be further developed through discovery, Defendants ACS, Szewczuk, Morgano, Semexant, Bendet, Markowitz and the ACS Employees each presented or provided fabricated evidence and testimony or false opinions, some of which was obtained by coercion and intimidation, at the initial fact-finding hearing to secure a temporary order of protection.

221.     On information and belief Defendant Adejobi was aware that such fabricate evidence and false opinions were being given, but did nothing to stop them.

222.     Defendants ACS, Szewczuk and Morgano permitted Plaintiffs no fair opportunity to prepare and present their own evidence at the initial hearing.

223.     Instead, the hearing was adjourned on the specious assertion that Defendant ACS needed time to conduct additional fact-finding.

224.     When the hearing reconvened, Plaintiffs requested to be permitted to present their evidence and the expert testimony of an expert they brought for the purpose, but were not granted the opportunity to do so.

225.     Instead, Defendants ACS, Szewczuk and Morgano repeatedly secured additional adjournments on the same false assertion that they needed to engage in additional "fact finding", securing additional temporary orders of protection, which were in turn each renewed or replaced.

226.     Although the Plaintiffs were prepared to present their evidence to the court, at each of these hearings they were never permitted to do so, and their daughter remained in the custody of Defendant ACS for over 40 months.

227.     Defendant ACS frequently failed to give reasonable prior notice of subsequent hearings, sometimes giving no notice at all, and sometimes not providing notice until the Plaintiffs were actually in the courthouse.

228.     On information and belief, to be further developed through discovery, Defendants ACS, Szewczuk and Morgano withheld notice intentionally, so that Plaintiffs would never have a chance to present their own evidence and witnesses, and so that Defendant ACS could continue to hold the children.

229.     Without notice, Plaintiffs were unable to attend a number of subsequent proceedings.

230.     Defendant ACS eventually obtained nineteen consecutive temporary orders of protection this way, and as a result kept F.S. in its custody for over 40 months, all the while denying Plaintiffs the opportunity to present their evidence and their witnesses.

231.    Because the Article 10 fact-finding hearing was never concluded, when the child reached the age of majority in May of 2020 the case was dismissed.

232.    As a result of the dismissal, there was never a final appealable order.

233.    Due to the repeated adjournments and the lack of notice of subsequent hearings Plaintiffs were completely denied a fair hearing at which to present their evidence and expert testimony.

234.    Defendants' actions were performed intentionally or with deliberate indifference and callous disregard of the Plaintiffs' rights.

235.    The conduct of Defendants ACS, Szewczuk, Morgano, Semexant, Adejobi and the other ACS Employees in repeatedly adjourning the fact-finding hearing and failing to provide notice of subsequent hearings completely denied Plaintiffs an opportunity to present their evidence and witnesses, and violated the Plaintiffs' right to procedural Due Process of law in violation of the 14th and 5th Amendments to the United States Constitution.

236.    When it became obvious that the pattern of repeated adjournments was intentional and continuing, Plaintiffs sought to file for substantive relief via mandamus in the New York Supreme Court, and to file appeals of the temporary orders of protection prohibiting the release of their children.

237.    However, Defendants Hopkins, Randall and Coakley, and John and Jane Doe, each engaged in specific actions to delay the frustrate the filing and consideration of Plaintiffs filings and appeals.

238.    Defendants intimidating acts included: hostile and derisive comments to and about the Plaintiffs and their ethnicity; forcing them to wait hours at a time before their filings or requests would be considered; locking the doors against them; surrounding them with security

39

guards to intimidate them; outright refusals to accept and file Plaintiffs' papers; and other actions described in this complaint.

239.    Defendants' conduct completely foreclosed Plaintiffs' state law right to appeal the fraudulently-based temporary orders, and rendered them unable to obtain an order commanding the Court to grant them an evidentiary hearing, both of which resulted in their continuing separation from their children F.S. and I.S. for up to 40 months.

240.    Defendants' actions were performed intentionally or with deliberate indifference and callous disregard of the Plaintiffs' rights.

241.    The conduct of Defendants Hopkins, Coakley and Randall, in repeatedly intimidating the Plaintiffs and intentionally frustrating and delaying their filings and delaying processing their appeals until the matters became moot, violated the Plaintiffs' right to procedural Due Process of law in violation of the 14th and 5th Amendments to the United States Constitution.

242.    The Plaintiffs suffered grievous physical and emotional injury, embarrassment, financial damages, and pain and suffering to themselves and their family as a result of being denied their constitutional rights and forcibly separated from their daughter for which the Defendants should be made to pay damages.

243.    The Defendants conduct described above and in the facts of this complaint was the cause in fact and the proximate cause of the Plaintiffs' injury.

244.    WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, for:

        g.  $240,000,000.00 in compensatory damages;
        h.  $240,000,000.00 in punitive damages;
        i.  Reasonable attorney fees, if any;
        j.  Costs of suit;

k.   Interest;

l.   Any other and further relief that the Court may deem just and proper.

COUNT THREE

42 U.S.C. § 1983

Due Process

Substantive Due Process

245.    The 2nd Circuit has "long recognized that parents have a "constitutionally protected liberty interest in the care, custody, and management of their children,"[] and that the deprivation of this interest is actionable on a substantive due process theory."  Southerland, supra, at 142.

246.    "To establish a violation of substantive due process rights, a plaintiff must demonstrate that the state action was `so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'"  Id. at 152.

247.    In or about February of 2017, Defendant ACS, and its employee Defendant Semexant, initiated an investigation of F.S., who had been reported missing by her parents. Her investigation was supervised and overseen by Defendant Adejobi.

248.    That investigation was joined and furthered by the Defendants ACS Employees and Defendants Peter Hill and Nicholas Smith who each participated during this period in the investigation of F.S., by conducting interviews of the Plaintiffs and third parties, reviewing documents, and taking other related actions.

249.    Despite not having the Plaintiffs' consent, the circumstances did not justify a pre-petition removal, and neither she nor any other ACS agent had sought a pre-petition order for

41

removal, Defendant Semexant and the ACS Employees seized and interviewed F.S. with the knowledge and approval of Defendant Adejobi

250.    After completing her interview and the investigation, Semexant and the ACS Employees concluded that there was no evidence to believe the child had been neglected or abused.

251.    Despite that conclusion, Defendants ACS, Semexant and the ACS Employees refused to return F.S. to the custody of the Plaintiffs but placed her temporarily with her aunt.

252.    On information and belief, to be further developed through discovery, Defendants ACS, Semexant, Adejobi and the ACS Employees reached an agreement with Defendants Jacobs, Szewczuk, and Morgano to prepare and file an Article 10 petition to remove F.S. permanently from her parents.

253.    On information and belief, to be further developed through discovery, the petition was based on substantially false and outdated information, including false factual testimony by Defendants Szewczuk and Morgano.

254.    Defendants Szewczuk and Morgano, as attorneys for Defendant ACS, adjourned the initial hearing repeatedly intending to prevent the Plaintiffs from presenting their evidence and expert witnesses.

255.    As a result of the repeated adjournments, Plaintiffs were completely prevented from introducing their evidence into the record and denied a full and fair hearing at which they could obtain a ruling from the court returning the children to their custody.

256.    Defendants ACS, Semexant, the ACS Employees, Szewczuk and Morgano applied for a temporary order of protection for F.S. without evidence sufficient to conclude that

42

the child was then at imminent risk of harm in her parents' care.  Defendant Adejobi was aware of this did nothing to stop it.

257.     Even after Judge Greubel issued an order for reunification efforts to begin, Defendants Adejobi, Francis, Henderson, and Fraser refused to initiate efforts to reunify the family.

258.     Defendants ACS, Semexant, Adejobi, Francis, Fraser, the ACS Employees, Szewczuk and Morgano  repeatedly renewed the original order of protection nineteen times, effectively preventing F.S. from returning to her family for the entire remainder of her childhood.

259.     The conduct of Defendants ACS, Semexant, Adejobi, Francis, Fraser, the ACS Employees, Szewczuk and Morgano, which caused the separation of the Plaintiffs from their daughter without any findings of neglect or abuse for a period of 40 months was so egregious and so outrageous that it may be fairly said to shock the contemporary conscience.

260.     The above-described conduct of Defendants ACS, Semexant, Adejobi, Francis, Fraser, the ACS Employees, Szewczuk and Morgano, in cooperation with Defendant Jacobs, was performed intentionally or with deliberate indifference and callous disregard of the Plaintiffs' rights, denied them their right to family integrity, and deprived Plaintiffs of their right to Substantive Due Process of law under the Fifth and Fourteenth Amendments to the Constitution of the United States and 42 U.S.C. § 1983.

261.     The Plaintiffs suffered grievous physical and emotional injury, embarrassment, financial damages, and pain and suffering to themselves and their family as a result of being denied their constitutional rights and forcibly separated from their daughter and son for which the Defendants should be made to pay damages.

43

262.     The Defendants conduct described above was the cause in fact and the proximate cause of the Plaintiffs' injury.

263.     WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, for:

   a. $240,000,000.00 in compensatory damages;
   b. $240,000,000.00 in punitive damages;
   c. Reasonable attorney fees, if any;
   d. Costs of suit;
   e. Interest;
   f. Any other and further relief that the Court may deem just and proper.

## COUNT FOUR

## 42 U.S.C. § 1983

## FAILURE TO ADEQUATELY TRAIN AND SUPERVISE

264.     A municipality may be responsible under § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694, 98 S. Ct. 2018, 2037–38, 56 L. Ed. 2d 611 (1978)

265.     The 2nd Circuit requires the establishment of (i) moral certainty that a situation would be encountered, (ii) the situation is one requiring training, and (iii) the wrong decision would frequently deny a citizen's constitutional rights.  Walker v. City of New York,  , 974 F.2d 293 (2d Cir. 1992)

266.     As the agency responsible to investigate claims of child abuse and neglect and to take appropriate steps to protect them, it is a virtual certainty that ACS employees and caseworkers will encounter situations where children may be removed from their parents' custody.

267.     The evaluation of whether and on what terms to remove a child from her parents without a court order is a matter requiring training in order to exercise appropriate judgment.

268.     The evaluation of whether and on what terms to file a removal petition seeking to remove custody of a child is a matter requiring training in order to exercise appropriate discretion.

269.     The evaluation of whether and on what terms to reunite a child with their parents is a matter requiring training in order to exercise appropriate discretion.

270.     ACS policy recognizes that separation of a child from her parents can cause children significant damage.

271.     Defendant Hansell as the head of Defendant ACS was responsible to train Defendant Semexant and the other ACS Employees on the matters described above, but failed to do so.

272.     Defendant Hansell failed to adequately train Defendants Semexant, Fraser and the other ACS Employees on ACS policies and procedures concerning (i) removal without a court order; (ii) conditions justifying filing a removal petition, (iii) appropriate preparation and completion of a meaningful and appropriate service plan review of the permanency goal of return to the parents; and (iv) reestablishment of contact between F.S. and her parents.

273.     As her direct supervisor, Defendant Adejobi was also responsible to see that Defendant Semexant and other ACS agents under her supervision were adequately trained on ACS policies and procedures but failed to  do so.

274.     As her direct supervisor, Defendant Henderson was also responsible to see that Defendant Fraser and other ACS agents under her supervision were adequately trained on ACS policies and procedures but failed to  do so.

275.    As a direct and proximate result of the failures by Defendant Hansell and Defendant Adejobi, Defendants Semexant, Fraser, and the other ACS Employees made completely incorrect decisions to remove F.S. without a court order, to bring a removal petition, and to deny all contact between F.S. and her parents for the next 40 months.

276.    Defendants Semexant and the other ACS Employees investigated F.S. and improperly determined that she should be removed from her parents without a court order.

277.    Defendants Semexant and the other ACS Employees determined incorrectly and improperly to bring a petition to remove custody of F.S. from her parents.

278.    Defendant Semexant and the other ACS Employees improperly failed to reestablish any contact whatsoever between F.S. and her parents.

279.    As a direct and proximate result of Defendant Hansell's and Defendant Adejobi's failure to adequately train Defendants Semexant and the other ACS Employees, Plaintiffs' constitutional right to familial association with F.S. was completely denied for over 40 months.

280.    The above-described failure of Defendant Hansell and Defendant Adejobi to properly train Defendant Semexant and the ACS Employees denied Plaintiffs their right to family integrity, and deprived Plaintiffs of their right to Substantive Due Process of law under the Fifth and Fourteenth Amendments to the Constitution of the United States and 42 U.S.C. § 1983.

281.    Defendant Hansell and Defendant Adejobi were both aware of and approved ACS' unofficial policy of taking children in questionable circumstances and keeping them for as long as possible in agency custody to enhance agency revenues.

282.    On or about March 2017, Plaintiff Miriam Schvimmer personally met with Defendant Hansell and informed him of ACS' unconstitutional activity in taking and holding her child without parental consent or legal justification.

283.    Defendant Hansel could have, but did not, take any steps to stop the implementation of the unofficial agency policy.

284.    The Plaintiffs suffered grievous physical and emotional injury, embarrassment, financial damages, and pain and suffering to themselves and their family as a result of being denied their constitutional rights and forcibly separated from their daughter and son for which the Defendants should be made to pay damages.

285.    The Defendants conduct described above was the cause in fact and the proximate cause of the Plaintiffs' injury.

286.    WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, for:

m. $240,000,000.00 in compensatory damages;
n. $240,000,000.00 in punitive damages;
o. Reasonable attorney fees, if any;
p. Costs of suit;
q. Interest;

287.    Any other and further relief that the Court may deem just and proper.

## COUNT FIVE

### 42 U.S.C. § 1983

### DENIAL OF ACCESS TO COURTS

288.    The 2nd Circuit recognizes a substantive constitutional right of access to the Court grounded in the 1st Amendment, the Due Process Clause of the 5th and 14th Amendments and

47

the Privileges and Immunities Clause of Article IV, section 2.  See *Morello v. James*, 810 F.2d 344 (2nd Cir. 1987); see also *Jackson v. Burke*, 256 F.3d 93 (end Cir. 2000).

289.    Plaintiffs had a right to pursue appeals of the temporary orders of protection and other interim orders issued by the Family Court in the Article 10 proceedings.  See N.Y.S. § 1111

290.    Plaintiffs likewise had a right to pursue other substantive relief, in the form of habeas relief and seeking mandamus, in the New York Supreme Court.  See, e.g., N.Y.S. § 7801

291.    However, On information and belief, to be further developed through discovery Defendants John and Jane Doe, who are or were employees within the OCA clerk's office, conspired and acted in cooperation with Defendant Jacobs, Defendant ACS and other Defendants in an intentional effort to frustrate Plaintiffs efforts to appeal the temporary orders of protection issued by the Family Court that effectively imprisoned their children in ACS custody, and to obtain mandamus commanding the family court to take action.

292.    Defendants John and Jane Doe cooperated with and assisted Defendant Jacobs to "judge shop" until he was able to find and place the case with a judge that Defendants felt was most appropriate to their scheme to file and maintain a false Article 10 proceeding.

293.    When the Plaintiffs sought to file papers in the Office of Court Administration, Defendants Randall, Hopkins and Coakley subjected them to ridicule by belittling their heritage in the hope that the humiliation and embarrassment would dissuade the Plaintiffs from filing their papers, or coming again to the Clerk's office.

294.    Defendants Randall, Hopkins and Coakley similarly subjected the Plaintiffs to intimidation by surrounding them with security officers in the clerk's office with the same intention.

295.     Defendants Randall, Hopkins and Coakley also sought to delay and frustrate Plaintiffs filing by locking them out of the office and forcing them to wait in the hall for excessive lengths of time.

296.     Defendants Randall, Hopkins, Coakley and John and Jane Doe refused to file Plaintiffs' papers in the clerk's office.

297.     The Defendants' actions caused Plaintiffs' appeals to be dismissed as moot.

298.     The Defendants' actions rendered hollow Plaintiff's right to redress.

299.     The Defendants' actions foreclosed the Plaintiffs' ability to secure mandamus causing the Family Court to hold an evidentiary hearing and receive Plaintiffs' evidence and obtain release of their children from ACS custody, denying them their right to family integrity.

300.     All of these actions were taken in furtherance of the Defendants' scheme and conspiracy to keep the Schvimmer children in the custody of Defendant ACS so that additional federal and state revenue would inhere to the agency and to those allied Defendants such as Jacobs, Hansell, Szewczuk, Semexant and the other ACS Employees, Bendet, Markowitz and Katz, all of whom profited by their employment and association with child neglect and abuse proceedings.

301.     The actions taken by Defendants Randall, Hopkins, Coakley and John and Jane Doe in furtherance of the conspiracy to hold the children unlawfully in Defendant ACS custody were not within the lawful scope of their duties as clerks of court, or employees engaged in the clerk's office.

302.     The Plaintiffs suffered grievous physical and emotional injury, embarrassment, financial damages, and pain and suffering to themselves and their family as a result of being denied their constitutional rights for which the Defendants should be made to pay damages.

303.    The Defendants conduct described above was the cause in fact and the proximate cause of the Plaintiffs' injury.

304.    WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, for:

      a. $240,000,000.00 in compensatory damages;
      b. $240,000,000.00 in punitive damages;
      c. Reasonable attorney fees, if any;
      d. Costs of suit;
      e. Interest;

      f. Any other and further relief that the Court may deem just and proper.

## COUNT SIX

## 42 U.S.C. § 1983

## Conspiracy To Violate Civil Rights

305.    The 2nd Circuit recognizes a cause of action for conspiracy to violate civil rights under Section 1983 where: (1) an agreement exists between two or more state actors or a state actor and a private entity (2) to act in concert to inflict an unconstitutional injury, and (3) an overt act is done in furtherance of that goal and causing some harm. *See Ciambriello v. County of Nassau,* 292 F.3d 307, 324–25 (2d Cir.2002).

306.    Defendant ACS, through Defendant Adejobi, Semexant and the other ACS Employees and its various Defendant agents named herein, conspired and reached agreement with other Defendants including Defendant Jacobs, Defendant Katz, Defendant Randall, Defendant Hopkins, Defendant Coakley, Defendant Markowitz, Defendant Bendet, Defendant Hill and Defendant Smith upon a scheme to deny Plaintiffs their 1st Amendment right of access to the Courts, right to due process of law under the 5th and 14th Amendment, right to be free from

50

unreasonable searches and seizures under the 4th Amendment, and fundamental right to family integrity, through implementation of unpublished but accepted Defendant ACS policy to keep children in the custody of Defendant ACS for as long as possible with a goal to maximize and enhance the agency's revenue, and their own financial well-being.

307.    Each of the Defendants involved in the conspiracy who was not employed by Defendant ACS acted at all times under color of state law with state agents through their involvement in seizing and restraining Plaintiffs' children without legal justification, participating in and supporting through testimony and other means a fraudulent Article 10 child removal proceeding, and taking actions to frustrate Plaintiffs' efforts to seek other judicial relief and to appeal interim orders in the New York Supreme Court.

308.    Defendants Adejobi, Semexant and the ACS Employees (Karen McNeely, Carmalita Cyrus, Beverly Drayton, Kathy Ann Best), together with Defendants Smith and Hill, during the existence of the conspiracy met with each other and with Defendant Szewczuk, Defendant Morgano, Defendant Jacobs, Defendant Katz, Defendant Bendet, Defendant Markowitz  and non-party Sarah Rosenfeld to discuss and plan and coordinate and reached agreement and acted in concert with one another to deny the Plaintiffs their constitutional rights by seizing and restraining F.S. without her parents' consent or legal justification, by concealing F.S. to avoid the writ of habeas corpus then issued out of the New York Supreme Court, by continuing to restrain F.S. despite knowing that she was not in danger and that her parents were fit, by arranging to file a false Article 10 petition in Family Court and engaging in judge-shopping, by maintaining and participating in the prosecution of the fraudulent Article 10 petition including the giving of  false and fraudulent testimony, and by repeatedly and for a

period of 40 months denying Plaintiffs an opportunity to present testimony and evidence on their own behalf, all as further detailed in the facts above.

309.     On information and belief, to be further developed through discovery, Defendants ACS, Jacobs, Szewczuk, Morgano and Markowitz enlisted and reached agreement and acted in concert with Defendants Randall, Hopkins and Coakley to deny the Plaintiffs their constitutional rights by frustrating and intimidating and refusing them from filing and obtaining documents in the OCA, and by further taking other action with the goal of frustrating, delaying, and sidelining their applications to appeal temporary orders of protection issued by the Family Court, and by frustrating, delaying and denying them the ability to file documents seeking mandamus and other judicial relief in the New York Supreme Court, as further detailed in the facts above.

310.     Each of the members of the articulated conspiracy took action in furtherance of the conspiracy, which in and of itself may not have deprived Plaintiffs constitutional rights, but collectively with action by the other members of the conspiracy did so deprive them.

311.     The Plaintiffs suffered grievous physical and emotional injury, embarrassment, financial damages, and pain and suffering to themselves and their family as a result of the conspiracy whereby they were denied their constitutional rights to procedural and substantive due process of law, to freedom from unreasonable search and seizure, and to access to the courts, for which the Defendants should be made to pay damages.

312.     The Defendants conduct described above was the cause in fact and the proximate cause of the Plaintiffs' injury.

313.     WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, for:

g.  $240,000,000.00 in compensatory damages;
h.  $240,000,000.00 in punitive damages;

52

i.  Reasonable attorney fees, if any;

j.  Costs of suit;

k.  Interest;

l.  Any other and further relief that the Court may deem just and proper.

COUNT SEVEN

42 U.S.C. § 1985

Conspiracy To Violate Civil Rights

314.    The 2nd Circuit identifies the four elements of a § 1985(3) claim as: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right of a citizen of the United States. *Mian v. Donaldson, Lufkin & Jenrette Securities Corp.*, 7 F.3d 1085 (2nd Cir. 1993)

315.    On information and belief, to be further developed through discovery, Defendant ACS, through Defendant Semexant and the other ACS Employees and its various Defendant agents named herein, conspired and reached agreement with other Defendants including Defendant Jacobs, Defendant Katz, Defendant Randall, Defendant Hopkins, Defendant Coakley, Defendant Markowitz, Defendant Bendet, Defendant Hill and Defendant Smith to implement ACS unofficial policy discriminating against Hasidic Jewish parents, and to subject the Plaintiffs to different standards than Defendant ACS applied to parents of other heritage.

316.    Defendants Semexant and the ACS Employees (Karen McNeely, Carmalita Cyrus, Beverly Drayton, Kathy Ann Best), together with Defendants Smith and Hill, during the existence of the conspiracy met with each other and with Defendant Jacobs, Defendant Katz, and Defendant Bendet to discuss and plan and coordinate and reach agreement and acted in concert

with one another to deny the Plaintiffs their constitutional rights by seizing and restraining F.S. without her parents' consent or legal justification, by concealing F.S. to avoid the writ of habeas corpus then issued out of the New York Supreme Court, by continuing to restrain F.S. despite knowing that she was not in danger and that her parents were fit, by arranging to file a false Article 10 petition in Family Court and engaging in judge-shopping, by maintaining and participating in the prosecution of the fraudulent Article 10 petition including the giving of  false and fraudulent testimony, and by repeatedly and for a period of 40 months denying Plaintiffs an opportunity to present testimony and evidence on their own behalf, all as further detailed in the facts above.

317.     On information and belief, to be further developed through discovery, Defendants Szewczuk, Morgano, Sangenito, Randall, Hopkins and Coakley met and  conspired and reached agreement between themselves to deny the Plaintiffs their federal constitutional right of access to the courts based upon Plaintiffs' status as members of the jewish faith.

318.     Defendants Randall, Hopkins and Coakley acted upon such conspiracy by intimidating the Plaintiffs with name-calling based upon their jewish faith, surrounding them with security officers, by locking the doors to the clerk's office against them, by refusing their filings, and by making them wait excessively long times to file and obtain documents, as detailed in the facts above.

319.     The Plaintiffs suffered grievous physical and emotional injury, embarrassment, financial damages, and pain and suffering to themselves and their family as a result of being denied their constitutional rights for which the Defendants should be made to pay damages.

320.     The Defendants conduct described above was the cause in fact and the proximate cause of the Plaintiffs' injury.

321.    WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, for:

    m.  $240,000,000.00 in compensatory damages;
    n.  $240,000,000.00 in punitive damages;
    o.  Reasonable attorney fees, if any;
    p.  Costs of suit;
    q.  Interest;

    r.  Any other and further relief that the Court may deem just and proper.

## COUNT EIGHT

## 42 U.S.C. § 1986

## NEGLECT TO PREVENT VIOLATION OF CIVIL RIGHTS

322.    Each of Defendants ACS, Hansell, Adejobi, Semexant, Henderson, Francis, Fraser and the ACS Employees, together with Defendants Smith and Hill, along with Defendant Szewczuk, Defendant Morgano, Defendant Jacobs, Defendant Katz, Defendant Bendet, Defendant Markowitz were each aware of the conspiracy to deny Plaintiffs their constitutional rights of access to the court, due process of law, and freedom from unreasonable search and seizure, and were in a position to prevent the commission of the same, and could have by reasonable diligence prevented the same.

323.    Each of Defendants ACS, Adejobi, Semexant, Henderson, Francis,  Fraser and the ACS Employees, together with Defendants Smith and Hill, along with Defendant Szewczuk, Defendant Morgano, Defendant Jacobs, Defendant Katz, Defendant Bendet, and Defendant Markowitz negligently failed to prevent Plaintiffs' rights from being violated.

324.    On information and belief, to be further developed through discovery, Defendant Hansell knew that his agency was implementing an unofficial policy of taking children without

55

sufficient legal justification or parental consent, but did nothing to stop it although by reasonable diligence he could have done so.

325.    Defendants ACS, Semexant, the ACS Employees, Hill and Smith had active participation in the investigation of F.S. and knew that the seizure of Plaintiffs' child F.S. did not meet the legitimate threshold for a pre-hearing removal, but did nothing to prevent it or re-unify the child with her family, although with reasonable diligence each of them could have done so.

326.    On information and belief, to be further developed through discovery, Defendant Szewczuk, Defendant Morgano, Defendant Jacobs, Defendant Katz, Defendant Bendet, Defendant Markowitz,  Defendant Randall, Defendant Hopkins and Defendant Coakley each had personal knowledge of the conspiracy to deny Plaintiffs their federal constitutional right of access to the courts based upon Plaintiffs' status as members of the jewish faith.

327.    Each of Defendant Szewczuk, Defendant Morgano, Defendant Jacobs, Defendant Katz, Defendant Bendet, Defendant Markowitz,  Defendant Randall, Defendant Hopkins and Defendant Coakley were in a position to prevent the commission of the same, and could have by reasonable diligence prevented the same.

328.     Each of Defendant Szewczuk, Defendant Morgano, Defendant Jacobs, Defendant Katz, Defendant Bendet, Defendant Markowitz,  Defendant Randall, Defendant Hopkins and Defendant Coakley negligently failed to take action to prevent the violation of Plaintiffs' constitutional rights.

329.    The Plaintiffs suffered grievous physical and emotional injury, embarrassment, financial damages, and pain and suffering to themselves and their family as a result of the Defendants failing to take action to prevent the violation from occurring.

330.    The Defendants conduct described above was the cause in fact and the proximate cause of the Plaintiffs' injury.

331.    WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, for:

s. $240,000,000.00 in compensatory damages;
t. $240,000,000.00 in punitive damages;
u. Reasonable attorney fees, if any;
v. Costs of suit;
w. Interest;
x. Any other and further relief that the Court may deem just and proper.

## COUNT NINE

### 18 U.S.C. §§1961-1968; §1962(a» *i*
(RICO)

332.    Each Plaintiff is a natural person.  ("person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964.)

333.    Each Defendant other than Defendant ACS is a natural person.  ( "person" within the meaning of 18 U.S(C. §§196I(3) and 1964.

334.    All Defendants except Defendant ACS (the "Enterprise Defendants") operate together in the form of an association-in-fact with respect to their conduct described herein and a criminal enterprise (the "Child Abduction Enterprise").

335.    The purpose of the Child Abduction Enterprise is to advance the pecuniary interests of all of the Defendants, whereby each of the Defendants received personal income from participating in the unauthorized and unlawful seizure and retention of custody of vulnerable children, often from vulnerable segments such as Hasidic Jewish children.

336.    On information and belief, Defendant ACS receives $4,000 to $6,000 per child for each child that it removes from their parents and home and holds in the custody of Defendant ACS, whether directly or by being placed with a stranger.

337.    On information and belief each of the Enterprise Defendants receives salary or wage income for the time that they spend involved in the activities described herein to support the Child Abduction Enterprise.

338.    Enterprise Defendants achieve the unauthorized and unjustified removal of children by means of the threatened use of law or legal process, whether administrative, civil or criminal, in a manner and for a purpose for which the law was not designed, in order to exert pressure on the parents and their children to take some action or avoid taking some action.

339.    In this case, the Enterprise Defendants together and individually conspired and acted to deny Plaintiffs' constitutional rights and to extort and place irresistible pressure on the Plaintiffs to surrender their rights to their children through threat of removal proceedings and loss of both children, and when that failed, through seizure of F.S. without consent and without legal justification and knowing that F.S. was not at risk of harm in her parents' home.

340.    When that failed, Enterprise Defendants conspired and acted individually and together to file false and fraudulent documents with the court to bring false and fraudulent Article 10 proceedings in Family Court, bypassing and willfully ignoring a valid writ of habeas corpus issued by the New York Supreme Court, and by the continued refusal to permit the Plaintiffs to present evidence at a fair hearing, to appeal temporary rulings, and to seek other judicial relief.

341.    The Enterprise Defendants caused injury and serious harm to the Plaintiffs, whether physical or non-physical, including mental, emotional, financial and reputational harm.

342.    The Enterprise Defendants have each taken action in furtherance of the Child Abduction Enterprise, inter alia, through use of communications with other Enterprise Defendants, the Plaintiffs and third parties, transmitted and/or caused to be transmitted by means of  wire communication in interstate commerce, and by writings, signals, sounds, faxes, and other such things as electronic transfers of funds, emails, text message, correspondence and similar electronic means.

343.    Each Enterprise Defendant was employed by or associated with the Child Abduction Enterprise.

344.    Each Enterprise Defendant took actions and participated directly and indirectly in, or aided and abetted, the conduct of the Child Abduction Enterprise through a pattern of racketeering activity.

345.    The Enterprise Defendants devised or intended to devise a scheme or artifice to defraud and commit extortion of the Plaintiffs; to wit, Defendant Bendet threatened Plaintiffs that if they did not sign her agreement, Plaintiffs would not see their daughter F.S.

346.    Beginning  in or around February 2, 2017, the Enterprise Defendants began to make explicit threats to the Plaintiffs that they understood to promise violence in the form of forcible removal of their children.

347.    Defendant Jacobs made statement to Plaintiffs that if she did not release F.S., they would "take" I.S., on information and belief, through forceful means.

348.    Defendant Katz made statements that if Plaintiffs did not go along, Plaintiffs' children should be forcibly removed and their parental rights terminated,

349.    In or about August of 2017, Defendant Smith made statements threatening the Plaintiffs that if they did not comply with Defendants' demands, Defendant ACS would forcibly remove I.S.

350.    Enterprise Defendants devised or intended to devise a scheme or artifice to defraud the citizens of New York, including the Plaintiffs, and to deprive those citizens, here the Plaintiffs, of the intangible right of honest services by means of wire communications in interstate commerce, including the sending and receiving of email, text messages and the making of phone calls.

351.    Enterprise Defendants took specific actions outlined above in furtherance of this scheme.

352.    On information and belief, subject to confirmation in discovery, each Enterprise Defendant intended to engage in the conduct of the enterprise with actual knowledge of its illegal activities, and intending to obtain money or cause the loss of property by means of material false statements and extortionate threats.

353.    The foregoing threats of violent action to remove the children unless the Plaintiffs acceded to the Defendants' demands were made over a period in excess of six months and caused the Plaintiffs fear, all in violation of 18.U.S.C. § 1951.

354.    The foregoing threats were made by means including wire communications in interstate commerce, to wit: the sending and receiving of email, text messages and the making of phone calls.

355.    The foregoing threats of violence were made in order to extort additional payments from the Plaintiffs to various Enterprise Defendants, and various Enterprise

Defendants did receive additional compensation following and as the result of the extortionate acts.

356.   The foregoing instances of racketeering activity, occurring over a period of over six months, constitutes a pattern, and were part of the Enterprise Defendants' regular way of business in operating what was essentially a "cash for kids" operation.

357.   On information and belief, the Enterprise Defendants made similar patterns of extortionate threats of violence against numerous other similarly-situated parents of Hasidic Jewish children and other vulnerable segments of the community.

358.   The Enterprise Defendants have each received compensation for their involvement in this matter as a result of their extortionate threats of violence and honest services theft.

359.   As a result of the numerous extortionate threats made by the Enterprise Defendants, the Plaintiffs suffered loss of their constitutional rights, and grievous physical and emotional injury, embarrassment, financial damages, and pain and suffering to themselves and their family for which the Defendants should be made to pay damages.

360.   The Defendants conduct described above was the cause in fact and the proximate cause of the Plaintiffs' injury.

WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, for:

    a.   $240,000,000.00 in compensatory damages;
    b.   $240,000,000.00 in punitive damages;
    c.   Treble damages under RICO;
    d.   Reasonable attorney fees, if any;
    e.   Costs of suit;
    f.   Interest;
    g.   Any other and further relief that the Court may deem just and proper.

COUNT TEN

STATE LAW CLAIM

INTENTIONAL/NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

361.    Each of Defendants ACS, Hansell, Semexant, and the ACS Employees, by virtue of their government roles and the existence of statutory and regulatory authority that applied to and governed the conduct of Defendant ACS, in particular those applying to the conduct of investigation and prehearing removal, and the conduct of child abuse and neglect proceedings, owed a duty to the Plaintiffs.

362.    Each of Defendants ACS, Hansell, Semexant, and the ACS Employees, have taken intentional action by seizing and restraining Plaintiffs' minor children and preventing from returning to their family, without parental consent or legal justification.

363.    Each of Defendants ACS, Hansell, Semexant and the ACS Employees breached their duties by failing to abide by the applicable statutes and regulations governing the conduct of the conduct of investigation and prehearing removal, and the conduct of child abuse and neglect proceedings and thereby allowing the seizing and restraining of Plaintiffs' minor children from returning to their family, without parental consent or legal justification.

364.    Each of Defendants Szewczuk, Morgano, Bendet, Markowitz, Hill and Smith are licensed professionals who owed Plaintiffs a duty by virtue of the rules governing the conduct of their professional practices.

365.    Each of Defendants Jacobs, Katz, Bendet, Markowitz, Hill and Smith have taken action by participating with Defendants ACS, Hansell, Semexant and the ACS Employees in seizing and restraining Plaintiffs' minor children from returning to their family, without parental consent or legal justification.

62

366.    Defendants Jacobs and Katz threatened the Plaintiffs that if they did not surrender their daughter F.S. for adoption by Defendant Jacobs' client, Plaintiffs would be subjected to violence, harassment, slander, ruination, and the loss of all contact with both of their remaining minor children, F.S. and I.S.

367.    Defendants Hill and Smith owed a duty to Plaintiffs and their children by virtue of their status as licensed professional social workers, and were obligated to comply with the rules and regulations applicable to the discipline.

368.    Defendants Hill and Smith failed to abide by their professional rules and regulations when they participated in the investigation and evaluation of the children in support of the scheme to seize the Plaintiffs' children without legal justification and permanently sever the family relationships.

369.    Each of the foregoing Defendants, acting individually and together, participated in the filing and pursuit of false and fraudulent Article 10 proceedings against the Plaintiffs, through which Defendants have separated the Plaintiffs from their children for over 40 months.

370.    Each of the Defendants, acting individually and together, took action to deny Plaintiffs the ability to receive a fair hearing and an opportunity to present evidence on their own behalf, and to deny them the ability to appeal interim decisions prohibiting contact between them and their children F.S. and I.S.

371.    Defendants acts were of a continuing nature, commencing in February of 2017, and continuing through many and varied actions up to the time the Article 10 petition was dismissed in May of 2020.

372.    Defendants acts, which effectively helped to kidnap and imprison the Plaintiffs' children for up to 40 months without legal justification, were extreme and outrageous, and were

taken intending to cause, or disregarding a substantial probability of causing, severe emotional distress to the Plaintiffs.

373.    As the result of Defendants act, Plaintiffs have suffered, and continue to suffer, severe mental and emotional distress, agony and anxiety, and the loss of their constitutional rights to be free of unreasonable searches and seizures, to due process of law, and to the preservation of familial integrity and association.

374.    As a direct and proximate case of Defendants' actions described above, Plaintiffs' family has been devastated, and Plaintiffs have suffered grievous physical and emotional injury for which they seek the following relief:

    a.  $240,000,000.00 in compensatory damages;
    b.  $240,000,000.00 in punitive damages;
    c.  Reasonable attorney fees, if any;
    d.  Costs of suit;
    e.  Interest;
    f.  Any other and further relief that the Court may deem just and proper.

## DEMANDS

WHEREFORE, Plaintiffs Israel & Miriam Schvimmer, personally and o/b/o the Minor Child I.S., demand from all Defendants Individually, jointly and/or severally, the following

    1.  $240,000,000.00 in compensatory damages;
    2.  $240,000,000.00 in punitive damages;
    3.  Treble damages under RICO
    4.  Reasonable attorney fees, if any;
    5.  Costs of suit;
    6.  Interest;
    7.  Any other and further relief that the Court may deem just and proper.

Trial by Jury is demanded on all issues so triable.

Dated: ____June 21, 2021

David E. Oles, Sr.
Attorney for Plaintiffs
Georgia Bar No. 551544
5755 Northpoint Parkway
Suite 25
Alpharetta, GA 30022
(770) 753-99995
firm@deoleslaw.com

TO:  All Counsel of Record

## CERTIFICATE OF SERVICE

This is to certify that I have this day filed 1ST AMENDED COMPLAINT**,** electronically

with the Clerk of Court using the CM/ECF system, which will send an electronic copy of the

following to Defendants' attorneys of record as follows:

**Pedro Angel Morales , Jr**
Office of Court Admin
25 Beaver Street
New York, NY 10004
212-428-2150
Fax: 212-428-2155
Email: pmorales@courts.state.ny.us


**Carolyn Kruk**
New York City Law Department
100 Church Street
New York, NY 10007
212-356-0893
Email: ckruk@law.nyc.gov

**Samantha Leigh Buchalter**
New York State Office of the Attorney General
28 Liberty Street
New York, NY 10005
212-416-6582
Fax: 212-416-6009
Email: samantha.buchalter@ag.ny.gov

**Glen Feinberg**
Wilson, Elser, Moskowitz, Edleman & Dicker, LLP
1133 Westchester Avenue
White Plains, NY 10604
914-872-7218
Fax: 914-323-7001
Email: glen.feinberg@wilsonelser.com

**Harvey S. Jacobs**
Harvey S. Jacobs, Esq.
26 Court Street
Ste 700
Brooklyn, NY 11242

66

718-237-9795
Fax: 718-855-2057
Email: hsjacobsesq@gmail.com

**Samantha Velez**
Rutherford & Christie, LLP
800 Third Avenue
Ste 9th Floor
New York, NY 10022
212-599-5799
Fax: 212-599-5162
Email: sv@rutherfordchristie.com

**Sally Simone Markowitz**
26 Court Street
Suite 901
Brooklyn, NY 11201
718-648-8200
Fax: 718-852-5360
PRO SE
ssmbklyn@aol.com

In addition, I have served a copy via Electronic Mail to the following pro se parties:

**Azriel Juda Katz**
407 Marcy Ave
4-A
Brooklyn, NY 11206
PRO SE
akatz.int.gov.affairs.ny@gmail.com

This 21st day of June, 2021.

OLES LAW GROUP

DAVID E. OLES
Georgia Bar Number 551544

67

Attorney for Plaintiffs

5755 Northpoint Parkway
Suite 25
Alpharetta, Georgia 30022
Tel:    (770)753-9995
Fax:    (877)207-3883
firm@deoleslaw.com