UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
ISRAEL SCHVIMMER, et al.,

                    Plaintiffs,

          - against -

RODERICK RANDALL, et al.,

                  Defendants.[1]
-------------------------------------------------------x

**MEMORANDUM & ORDER**
18-CV-7419 (PKC) (JRC)

PAMELA K. CHEN, United States District Judge:

     Plaintiffs Israel Schvimmer ("Israel") and Miriam Schvimmer ("Miriam"), a married couple, bring this lawsuit on behalf of themselves and their minor child I.S., alleging that an elaborate conspiracy unlawfully separated Israel and Miriam from I.S., and also unlawfully separated Israel, Miriam, and I.S. from Israel and Miriam's now-adult child, F.S. Before the Court are the motions of all, but one,[2] of the more than 20 Defendants. Defendants move to dismiss all claims in this action pursuant to Federal Rules of Civil Procedure ("Rules") 12(b)(1) and (6). Because Plaintiffs have not plausibly alleged any of their claims, all of the motions are granted and all of Plaintiffs' claims are dismissed as to all Defendants, including non-moving Defendant Rabbi Azriel Judah Katz and the John and Jane Doe Defendants. This action is hereby terminated.

---

    [1] Perplexingly, all of the parties have captioned this case *Schvimmer, et al. v. Office of Court Administration, et al.*, but the Office of Court Administration has been dismissed from this case. (06/23/2021 Docket Order.) Indeed, Plaintiff's Second Amended Complaint ("SAC") is captioned *Schvimmer, et al. v. Office of Court Administration, et al.*, yet the Office of Court Administration is not listed as a defendant.

    [2] The one additional Defendant in this case is Rabbi Azriel Judah Katz. Rabbi Katz is proceeding *pro se* and has not moved to dismiss the SAC, but, as discussed below, the Court is dismissing all claims as to him, as well.

## BACKGROUND

### I.      Original and First Amended Complaints

Plaintiffs filed this case, *pro se* and anonymously, on December 27, 2018.  (Dkt. 1.)  On January 4, 2019, Plaintiffs filed a First Amended Complaint ("FAC"), also *pro se*, which was substantially identical to the original complaint, but which identified Plaintiffs by name.  (Dkt. 4.)  All of the defendants in the FAC moved to dismiss and, on February 20, 2020, the Honorable William F. Kuntz, U.S.D.J., dismissed this case and denied Plaintiffs leave to amend.  (Decision & Order ("D&O"), Dkt. 90.)  Judge Kuntz did not extensively discuss the allegations in the FAC or Plaintiffs' claims, but stated that, "[u]pon careful review of the motion papers filed in this action, and construing all factual allegations in a light most favorable to Plaintiffs, the Court finds Plaintiffs have failed to state a claim upon which relief can be granted, even construing their originally pro se papers to make the strongest arguments they suggest."  (*Id.* at 2 (internal quotation marks omitted).)  Judge Kuntz denied Plaintiffs leave to amend because "they have had ample time to file a second amended complaint since their counsel noticed his appearance on March 27, 2019."  (*Id.*)

In a summary order, the Second Circuit reversed.  *Schvimmer v. Off. of Ct. Admin.*, 857 F. App'x 668 (2d Cir. 2021) (summary order).  The Court held that the court had "erred by failing to explain its reasons for dismissing the Schvimmers' complaint."  *Id.* at 671.  The Court stated that

> [t]he Schvimmers' pleadings and motion papers in the district court suggest that at least some claims would have been properly stated if leave to amend had been granted.  For example, the Schvimmers allege that their and their children's Fourth Amendment rights were violated when the ACS defendants temporarily seized and interviewed their children over their objections.  We have recognized that parents may assert such claims on their children's behalf.

*Id.* at 672.

The Circuit panel also noted that "the Schvimmers raised a plausible Fourteenth Amendment procedural due process claim based on the repeated denial of a full and fair hearing regarding extensions of a temporary order of protection separating them from their daughter." *Id.* As to this claim, the panel noted that "amendment would . . . indicate which defendants were involved with the family court hearings and permit the district court to determine whether such defendants may be entitled to some form of immunity from suit." *Id.* at 673.

On the issue of leave to amend, the panel noted that the Schvimmers had actually attempted to amend their complaint in July 2019, shortly after retaining counsel, but that Judge Kuntz had denied that request, telling the Schvimmers to wait until after the motions to dismiss were filed, and then denied Plaintiffs' request for leave to amend in response to the motions to dismiss for not having sought leave sooner. *Id.* Even without that, the panel observed that a ten-month delay without a showing of prejudice to the adverse parties would not be sufficient to deny a motion to amend. *Id.*

## II.      Remand and Second Amended Complaint

The case was reassigned to this Court on remand.  (05/03/2021 Docket Order.)  On June 21, 2021, Plaintiffs filed the SAC[3]—a 68-page, 374-paragraph complaint drafted by Plaintiffs' attorney.  (SAC, Dkt. 106.)

The SAC lists the following Defendants, who fall into seven categories of defendants, six of which are now moving for dismissal, with relevant subcategories:

### A.      Defendants

1.     The "Municipal Defendants"

- The City of New York ("City"), Administration of Children's

---

[3] Plaintiffs erroneously refer to their Second Amended Complaint as their First Amended Complaint.

Services ("ACS")[4]

- New York City Police Department ("NYPD") Detective Gwernan Buckner

- The "ACS Defendants"

    o    ACS Commissioner David A. Hansell

    o    The "ACS Attorneys":
        – John Morgano
        – Ian Sangenito
        – Rebecca Szewczuk

    o    The "ACS Supervisors and Caseworkers":
        – Airat Bakare-Adejobi
        – Kathy-Ann Best
        – Carmalita Cyrus
        – Beverly Drayton
        – Cecily Francis
        – Wanda Fraser
        – Lottie Henderson
        – Karen McNeely
        – Syndia Semexant

2.    The "State Defendants" or "OCA Defendants"

- Roderick Randall, Office of Court Administration ("OCA") clerk
- Joyce Hopkins, an OCA clerk
- John Coakley, an OCA clerk
- John Doe, an OCA Employee
- Jane Doe, an OCA Employee

3.    The "Social Worker Defendants"[5]

---

[4] In their SAC, Plaintiffs list the City and ACS as separate Defendants, but state that, "[a]s an agency of Defendant [City], all references to liability of Defendant ACS shall mean the liability of Defendant [City]."  (SAC, Dkt. 106, ¶ 42.)  That is consistent with the New York City Charter, under which City departments are not suable, and any actions against them must instead be brought against the City.  *Thomas v. Adm'r of Children's Servs.*, No. 21-CV-47 (MKB), 2021 WL 493425, at *2 (E.D.N.Y. Feb. 10, 2021).

[5] In their SAC, Plaintiffs erroneously identify Smith and Hill as ACS caseworkers, but they do not work for ACS and are represented by separate counsel in this matter.

4

- Peter Hill, a licensed clinical social worker ("LCSW")
- Nicholas Smith, LCSW

4. <u>Billa Tessler Bendet, a court-appointed therapist</u>

5. <u>Sally Simone Markowitz, a court-appointed guardian *ad litem*</u>

6. <u>Harvey Jacobs, an attorney who represented F.S.'s aunt in a custody proceeding</u>

7. <u>Rabbi Azriel Judah Katz</u>[6]

## B.   Plaintiffs' Factual Allegations

The following facts are drawn from the SAC.[7]

Israel and Miriam were married in September 1986 and have raised seven children together. (SAC, Dkt. 106, ¶ 79.) In July 2016, the couple filed for divorce. (*Id.* ¶ 80.) At the time, two children were still living in the marital home, F.S. (age 14) and I.S. (age 9). (*Id.*) The parents later reconciled, but in the interim, with Israel and Miriam's permission, F.S. moved out of the marital home and moved in with her uncle. (*Id.* ¶ 81–82.)

On February 1, 2017, F.S. left her uncle's home to walk to school, but did not return. (*Id.* ¶ 83.) Plaintiffs filed a missing person complaint and obtained an order from Judge Delores J. Thomas of the New York Supreme Court authorizing any peace officer to assist with bringing F.S. home. (*Id.* ¶¶ 84, 85.) Plaintiffs showed that order to Defendant Detective Buckner, who—that same day—spoke with Defendant Semexant, an ACS caseworker, who informed Detective Buckner that F.S. was at her paternal aunt and non-party Sarah Rosenfeld's house at the direction

---

[6] As mentioned, Defendant Rabbi Katz, who is proceeding *pro se*, has not moved to dismiss the SAC.

[7] As it must, the Court "accept[s] as true all factual allegations," but does not "credit conclusory allegations or legal conclusions couched as factual allegations." *Hamilton v. Westchester Cnty.*, 3 F.4th 86, 90–91 (2d Cir. 2021) (quoting *Dane v. UnitedHealthcare Ins. Co.*, 974 F.3d 183, 188 (2d Cir. 2020).

of ACS, even though Defendant Francis, an ACS supervisor, "falsely" recorded in her notes that F.S. was residing with non-party Sara Stern. (*Id.* ¶¶ 87, 90, 91.) Shortly thereafter, acting on an "anonymous" tip, ACS started a two-week investigation into F.S. and her circumstances, even though F.S. had "remained with her uncle since the agency had last found no dangers." (*Id.* ¶¶ 88–89.) Without Plaintiffs' consent, "Defendant Semexant, with the knowledge and under the supervision of Defendant Adejobi, along with Defendants McNeely, Cyrus, Drayton, and Best (the 'ACS Employees') detained and interviewed F.S.," and then, after determining that there would be no threat to returning F.S. to the marital home, placed F.S. in the Rosenfeld home. (*Id.* ¶¶ 93, 95–97.) On February 10, 2017, Plaintiffs obtained another *writ* of *habeas corpus* from Judge Thomas for the return of F.S. to Plaintiffs' home. (*Id.* ¶ 99.) Detective Buckner, however, told Judge Thomas that he did not know where F.S. was, even though he knew that ACS had placed her with Sarah Rosenfeld; Detective Buckner accordingly closed the missing person complaint. (*Id.* ¶¶ 100–102.) Rosenfeld had been in touch with Defendants Rabbi Katz, Attorney Jacobs (who represented Rosenfeld), Semexant, and the ACS employees about placing F.S. with Rosenfeld, all meeting in Attorney Jacobs's office while Plaintiffs were in court obtaining the *writ*. (*Id.* ¶ 103.)

The *writ* was served on Defendant Bendet, a court-appointed therapist, who attempted to "coerce" Plaintiffs into signing away their parental rights. (*Id.* ¶¶ 105-06.) The *writ* was also served on Defendant Markowitz, F.S.'s court-appointed guardian *ad litem*, who knew where F.S. was located but did not produce the child. (*Id.* ¶ 108.)

Plaintiffs also allege[8]:

Defendant Semexant, Adejobi, Francis, Fraser and the ACS Employees, thereafter secretly met and reached agreement with Defendants Jacobs, Katz, Markowitz and

---

[8] While much of these excerpts from the SAC contain conclusory accusations, rather than factual allegations, the Court recites them to provide context for the discussion of Defendants' motions to dismiss the claims that are based upon these allegations.

6

Bendet to frustrate, delay and thwart the Supreme Court writ, and prevent [F.S.'s] return to her parents and keep her in Defendant ACS custody, by diverting the case into an improper [family court] abuse and neglect proceeding . . . .

(*Id.* ¶ 110.)

The decision was based upon a desire by Defendant ACS to keep unauthorized and legally unjustified custody of the vulnerable child for as long as possible to maximize its revenues, upon the self-interested motives of the non-ACS parties in receiving revenue for their parts as attorneys, guardians, and allied professionals in the illegal plan, and upon the fact that Plaintiffs and their daughter were practicing Hasidic Jews who traditionally preferred to keep such matters within their own community.

(*Id.* ¶ 112.)

[In furtherance of their plan,] Defendants Semexant, Adejobi, Francis, Fraser and the other ACS Employees met and reached agreement with Defendants Jacobs, Katz, Hill [non-ACS LCSW], Smith [non-ACS LCSW], Bendet and Markowitz to provide false and misleading testimony and opinions in support of a[ removal] petition seeking to permanently remove F.S. and I.S. from the Plaintiffs so that ACS, and each of them, could receive a handsome stream of income from doing so.

(*Id.* ¶ 113.)

Defendant Hill prepared and provided false and fraudulent observations and recommendations to Defendant ACS in support of its decision to seek permanent removal of F.S. from her parents despite knowing that the child was not at risk and that the Plaintiffs were fit parents.

(*Id.* ¶ 117.)

Defendants Hopkins, Coakley and John and Jane Doe assisted Defendants Jacobs and Szewczuk to 'judge shop' through four successive judges and steer the case to a family court judge they felt would be most receptive to their improper claims.[9]

(*Id.* ¶ 122.)

---

[9] In a footnote, Plaintiffs state that they did not name as a defendant family court judge Gruebel "[w]ith due respect for the bench and judicial immunity," but also assert that "[t]he court appears to have played along with the Defendants' scheme, which would have been ultra vires the proper legal system," and that "[f]urther discovery into the case may inform the question of whether it is necessary to add Judge Gruebel as a party, and Plaintiffs reserve the right to do so in response to anticipated motions to dismiss." (*Id.* ¶ 122 n.6.)

> Defendant ACS, in conjunction with Defendant Jacobs and non-party Rosenfeld, continued to hide F.S. from her parents, at one point physically restraining her in a bathroom. . . . Defendant Jacobs and Defendant Katz met with the Plaintiffs and threatened that if they did not release F.S. to the custody of Defendant ACS and Rosenfeld, Defendants would see that I.S. was also taken by ACS.

(*Id.* ¶¶ 123, 124.)

On February 14, 2017, ACS sought a temporary court order of protection in the case of *In the Matter of A Child Under Eighteen Years of Age Alleged to Be Neglected by Miriam Schvimmer and Israel Schvimmer*, NN-04462-17 (N.Y. Fam. Ct. Feb. 14, 2017), to remove F.S. from her parents' custody.  (*See id.* ¶ 126.)  Defendants Attorneys Szewczuk and Morgano represented ACS.  (*Id.* ¶ 127.)  Plaintiffs allege that "ACS, Szewczuk, and Morgano were fully aware that ACS had previously concluded that there was no neglect or abuse in the Plaintiffs' household, but knowingly presented false and fraudulent information and fabricated testimony to the [family] court to present a false appearance of grounds to remove the children."  (*Id.* ¶ 128.)  Plaintiffs further allege that "Markowitz and Bendet each provided false and fictitious testimony in the [family court] proceedings in support of the effort to secure an unlawful removal order."  (*Id.* ¶ 133.)

ACS also obtained a temporary order of protection authorizing the removal of I.S. from Plaintiffs "without their consent or legal justification."  (*Id.* ¶ 135.)  In connection with that proceeding, Plaintiffs allege that "Defendants Szewczuk, Morgano, Sangenito [another ACS attorney], Hopkins and Coakley [both OCA clerks] assisted in the charade by withholding notice from Plaintiffs of subsequent proceedings, thereby intentionally excluding Plaintiffs from the courtroom."  (*Id.* ¶ 144.)  ACS obtained a series of temporary orders of protection as to F.S., "none of which included any finding that the children were at imminent risk of harm in their parents' household."  (*Id.* ¶ 146.)  ACS renewed its temporary order of protection 19 times over the next

40 months.  (*Id.* ¶ 149.)  Despite Judge Greubel issuing an order for reunification efforts as early as October of 2017, Defendant Fraser failed to comply with the reunification order.  She instead contacted Defendant Katz a number of times between December 2017 and May 2018, "and on information and belief discussed permanent custody [of F.S.] in ACS and a possible adoption by Rosenfeld in the simultaneous adoption proceedings brought by [Rosenfeld's] attorney, Defendant Jacobs."  (*Id.* ¶ 154.)

"At about this time, Defendant Katz made an unsolicited offer to Plaintiff Miriam [Schvimmer] that he could make this 'go away' if she gave him $40,00[0].00.  Plaintiffs viewed this as tantamount to an offer to pay a bribe, and refused."  (*Id.* ¶ 155.)

No final custody order was ever issued in F.S.'s case and, as such, fact finding was never concluded.  (*Id.* ¶¶ 158–59.)  Plaintiffs claim that when they "sought to file for appeal or mandamus in the clerk's office, they were met with intense hostility by Defendants Randall, Hopkins and Coakley and John and Jane Doe, who worked with each other to frustrate the progress of Plaintiffs' action," forcing Plaintiffs to wait, calling security on them, locking doors, refusing to accept Plaintiffs' papers, and calling Miriam a "dirty Jew."  (*Id.* ¶¶ 166–75.)

###    C.    Claims

The SAC asserts the following causes of action against the various groups of Defendants[10]:

- Count One: The Fourth Amendment (unreasonable seizure).

- Count Two: The Fifth and Fourteenth Amendments (procedural due process).

- Count Three: The Fifth and Fourteenth Amendments (substantive due process).

---

[10] Unless otherwise noted, all of the constitutional claims are brought pursuant to 42 U.S.C. § 1983.  Although Plaintiffs do not make it remotely clear which Counts are brought against which Defendants, the Court has done its best in the below analysis to determine which Counts Plaintiffs were attempting to bring against which Defendants.

- Count Four: The Fifth and Fourteenth Amendments (family integrity).

- Count Five: The First, Fifth, and Fourteenth Amendments (access to the courts).

- Count Six: Conspiracy to violate the First Amendment (access to the courts), Fourth Amendment (unreasonable seizure), Fifth and Fourteenth Amendments (due process) and Fifth and Fourteenth Amendments (family integrity).

- Count Seven: Conspiracy to violate the Fourteenth Amendment (equal protection), pursuant to 42 U.S.C. § 1985.[11]

- Count Eight: Neglect to prevent violation of the First Amendment (access to the courts), Fourth Amendment (unreasonable seizure), and Fifth and Fourteenth Amendment (due process), pursuant to 42. U.S.C. § 1986.

- Count Nine: Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–68.

- Count Ten: State Law Intentional / Negligent Infliction of Emotional Distress.

    1.  <u>Count One: Fourth Amendment Claim</u>

Plaintiffs allege in their Fourth Amendment claim that:

Defendants ACS, Semexant, Buckner, Adejobi, Francis, Henderson and Fraser, and the ACS Employees, performed intentionally or with deliberate indifference and callous disregard of the Plaintiffs' rights, in seizing, interviewing and restraining F.S. without a court order, her parents' permission or the existence of immediately threatened harm, deprived Plaintiffs of their right to be free of unreasonable searches and seizures in violation of the Fourth and Fourteenth Amendments to the Constitution of the United States and 42 U.S.C. § 1983.

(*Id.* ¶ 209.)

    2.  <u>Counts Two and Three: Due Process Claims</u>

Plaintiffs bring a procedural due process claim, alleging both that:

The conduct of Defendants ACS, Szewczuk, Morgano, Semexant, Adejobi and the other ACS Employees in repeatedly adjourning the fact-finding hearing and failing to provide notice of subsequent hearings completely denied Plaintiffs an opportunity to present their evidence and witnesses, and violated the Plaintiffs'

---

[11] Plaintiffs do not specify what law they believe this alleged "conspiracy to violate civil rights" violates, but the Court's best reading is that it attempts to allege religious discrimination against Hasidic Jewish people.

right to procedural Due Process of law in violation of the 14th and 5th Amendments to the United States Constitution.

The conduct of Defendants Hopkins, Coakley and Randall, in repeatedly intimidating the Plaintiffs and intentionally frustrating and delaying their filings and delaying processing their appeals until the matters became moot, violated the Plaintiffs' right to procedural Due Process of law in violation of the 14th and 5th Amendments to the United States Constitution.

(*id.* ¶¶ 235, 241).

Plaintiffs also bring a substantive due process claim, alleging that:

The conduct of Defendants ACS, Semexant, Adejobi, Francis, Fraser, the ACS Employees, Szewczuk and Morgano, which caused the separation of the Plaintiffs from their daughter without any findings of neglect or abuse for a period of 40 months was so egregious and so outrageous that it may be fairly said to shock the contemporary conscience.

(*Id.* ¶ 259.)

### 3.    Count Four: Right to Family Integrity

Plaintiffs further allege a violation of their right to family integrity under a theory

supervisory or municipal liability:[12]

The above-described failure of Defendant Hansell and Defendant Adejobi to properly train Defendant Semexant and the ACS Employees denied Plaintiffs their right to family integrity, and deprived Plaintiffs of their right to Substantive Due Process of law under the Fifth and Fourteenth Amendments to the Constitution of the United States and 42 U.S.C. § 1983.

(*Id.* ¶ 280.)

### 4.    Count Five: Denial of Access to the Courts

Plaintiffs assert a denial of access to the courts claim against Defendants Randall, Hopkins,

Coakley, and John and Jane Doe.  (*Id.* ¶¶ 288–304.)

---

[12] It is not clear which theory of liability Plaintiffs actually assert here, as discussed below.

5.   Count Six: Conspiracy to Violate Constitutional Rights

Plaintiffs globally allege a conspiracy to violate their rights of access to the courts, family integrity, to be free of unreasonable seizure, and to due process, against Defendants Adejobi, Semexant, Jacobs, Katz, Randall, Hopkins, Coakley, Markowitz, Bendet, Hill, Smith, McNeely, Cyrus, Drayton, Best, Szewczuk, and Morgano.  (*Id.* ¶ 306, 308.)

6.   Count Seven: Conspiracy to Deny Equal Protection

Plaintiffs allege another conspiracy to violate their civil rights, pursuant to 42 U.S.C. § 1985, based on an "unofficial policy discriminating against Hasidic Jewish parents," carried out by Defendants Semexant, McNeely, Cyrus, Drayton, Best, Smith, Hill, Jacobs, Katz, Bendet, Szewczuk, Morgano, Sangenito, Randall, Hopkins, and Coakley.  (*Id.* ¶¶ 315–17.)

7.   Count Eight: Negligent Failure to Prevent Violation of Civil Rights

Plaintiffs allege neglect to prevent violation of civil rights, pursuant to 42 U.S.C. § 1986, against Hansell, Adejobi, Semexant, Henderson, Francis, Fraser, Smith, Hill, Szewczuk, Morgano, Jacobs, Katz, Bendet, Markowitz, and "the ACS Employees."  (*Id.* ¶¶ 322–31.)

8.   Count Nine: Civil RICO Conspiracy

Count Nine alleges civil RICO conspiracy.  The Court quotes this claim at some length because it best captures Plaintiffs' theory of the case in general:

> All Defendants except Defendant ACS (the "Enterprise Defendants") operate together in the form of an association-in-fact with respect to their conduct described herein and a criminal enterprise (the "Child Abduction Enterprise").
>
> The purpose of the Child Abduction Enterprise is to advance the pecuniary interests of all of the Defendants, whereby each of the Defendants received personal income from participating in the unauthorized and unlawful seizure and retention of custody of vulnerable children, often from vulnerable segments such as Hasidic Jewish children.
>
> On information and belief, Defendant ACS receives $4,000 to $6,000 per child for each child that it removes from their parents and home and holds in the custody of Defendant ACS, whether directly or by being placed with a stranger.

12

On information and belief each of the Enterprise Defendants receives salary or wage income for the time that they spend involved in the activities described herein to support the Child Abduction Enterprise.

Enterprise Defendants achieve the unauthorized and unjustified removal of children by means of the threatened use of law or legal process, whether administrative, civil or criminal, in a manner and for a purpose for which the law was not designed, in order to exert pressure on the parents and their children to take some action or avoid taking some action.

In this case, the Enterprise Defendants together and individually conspired and acted to deny Plaintiffs' constitutional rights and to extort and place irresistible pressure on the Plaintiffs to surrender their rights to their children through threat of removal proceedings and loss of both children, and when that failed, through seizure of F.S. without consent and without legal justification and knowing that F.S. was not at risk of harm in her parents' home.

When that failed, Enterprise Defendants conspired and acted individually and together to file false and fraudulent documents with the court to bring false and fraudulent [removal] proceedings in Family Court, bypassing and willfully ignoring a valid writ of habeas corpus issued by the New York Supreme Court, and by the continued refusal to permit the Plaintiffs to present evidence at a fair hearing, to appeal temporary rulings, and to seek other judicial relief.

(*Id.* ¶¶ 334–40.)

### 9.   Count Ten: Negligent or Intentional Infliction of Emotional Distress

Finally, Plaintiffs assert a state law intentional/negligent infliction of emotional distress claim against Defendants Hansell, Semexant, "the ACS Employees," Szewczuk, Morgano, Bendet, Markowitz, Hill, Smith, Jacobs, and Katz.  (*Id.* ¶¶ 361–74.)

\*   \*   \*

Plaintiffs seek $480,000,000 and attorneys' fees and costs for each claim.  (*Id.* ¶¶ 212, 244, 263, 304, 313, 321, 331, 374.)

## III.   New York State Court Records

In support of the present motions to dismiss, Defendants have submitted dozens of records associated with the underlying state court proceedings.  In the Discussion Section below, the Court explains the extent to which it may rely on these records on the present motions.  Here, however,

the Court reviews those records in full because they provide an important supplement to Plaintiffs'

SAC, particularly with respect to the chronology of, and relationship between, various events.

### A.   Plaintiffs' 2016 Domestic Abuse Proceedings

On July 14, 2016, Miriam filed a family offense petition in family court, alleging that Israel

had punched and kicked her in front of F.S. and I.S., and seeking on order of protection against

Israel.  (Family Offense Petition, Dkt. 153-1.)  On July 19, 2016, Israel filed a lawsuit in New

York Supreme Court, alleging that Miriam had been physically violent toward him in front of their

children, and requesting that the Supreme Court take over the family court proceeding, grant

temporary custody of the children to Israel, and appoint an attorney for F.S. and I.S.  (Affidavit in

Support of Order to Show Cause, Dkt. 153.)

On September 15, 2016, a stipulation between the parties was so ordered, agreeing that

F.S. would remain with her maternal uncle and aunt until September 22, 2016.  (So Ordered

Stipulation, Dkt. 153-5.)  On October 14, 2016, Judge Thomas ordered Israel and Miriam to enroll

F.S. in therapy with Defendant Bendet.  (Order, Dkt. 155-1 at ECF 74.[13])

### B.   Plaintiffs' February 2017 *Writ* of *Habeas Corpus* Petition as to F.S.

On February 1, 2017 (the day F.S. allegedly went missing), Judge Thomas issued a *writ* of

*habeas corpus* directing all peace officers to assist with returning F.S. to Miriam's residence, as

Plaintiffs had requested.  (*Writ*, Dkt. 165-1.)  Additionally, on February 7, 2017, Judge Thomas

issued another *writ* directing numerous respondents named in the *writ* petition—mostly family

members of the Schvimmers, and none, except Bendet, who are Defendants here—to return F.S.

to Miriam's residence, with a hearing to be held on February 10, 2017.  (*Writ*, Dkt. 165-2.)  On

---

[13] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

February 10, 2017, Judge Thomas issued an Order to Show Cause why an order of protection should not be issued against the respondents of the *writ*, also with a hearing to be held on February 16, 2017.  (OTSC, Dkt. 155-1 at ECF 76–84.)

### C.    ACS's February 2017 Neglect Petition as to F.S.

Then, however, on February 14, 2017, ACS—through some of the attorneys and agents named as Defendants here—filed a neglect petition as to F.S., against Plaintiffs, in family court. (Petition, Dkt. 165-3.)  An addendum by Defendant Best, indicates that ACS interviewed F.S. on February 13, 2017, and that F.S. told Best that F.S. had fled the family home in September 2016 because of violence, including Miriam throwing bottles at F.S., and her mother hitting her father with a belt.  (*Id.* at ECF 6.)  F.S. also described an incident at a wedding where her mother followed her around calling her bi-polar, and told investigator Best that she (F.S.) had not attended school over the prior two weeks because she was afraid that her mother would come to school and take her.  (*Id.*)  During the interview, Best observed F.S. "crying, shaking and breathing heavy almost to the point of hyperventilating when discussing returning to the respondents['] home or even visiting with respondents."  (*Id.*)  Family court Judge Ilana Gruebel scheduled a hearing on the neglect petition for February 15, 2017.  (Order, Dkt. 165-4.)

Judge Gruebel held the hearing as scheduled.  (Feb. 15, 2017 Transcript ("Tr."), Dkt. 165-6.)  At the hearing, F.S. testified extensively and was subject to vigorous cross-examination by Plaintiffs' counsel.  (*Id.* at 53:2–124:25.)  She began by testifying that she had last lived with her mother in September 2016 and that she had been living with Sarah Rosenfeld for two weeks prior to the hearing.  (*Id.* at 55:10–16, 56:3–6.)  F.S. explained that she did not want to return to live with her mother and that she was afraid of her mother because her mother threatened her a lot.  (*Id.* at 56:10–16, 57:1–3.)  F.S.'s mother would threaten to call the police on her and tell F.S. that she was mentally ill (*id.* at 58:4–5), that there was "a lot" of domestic violence in the house (*id.* at

15

59:18), that her mother verbally abused her "very often"—"like four to five times per week, or even more, depending on the week" (*id.* at 104:3–10)—and that her mother also physically assaulted her "a lot" (*id.* at 105:22–25). While in court the day before the hearing, her mother had told F.S. that she should "have a brutal whip" and that F.S. would die "a brutal death." (*Id.* at 56:18–25, 79:22–80:4.) F.S. cried intermittently during the hearing. (*See, e.g.*, *id.* at 69:24.)

F.S. also described specific instances of domestic violence, such as her mother throwing a bottle at her father (*id.* at 60:4–5); her parents chasing each other around a table with belts in their hands and her mother ultimately hitting her father with the belt, causing him to fall down the stairs (*id.* at 62:21–63:12); her mother throwing plates at her brother, causing his head to bleed (*id.* at 80:5–12); and her parents screaming at each other while recording one another and telling F.S. that she would die, causing F.S. and I.S. to cry (*id.* at 71:7–72:21). F.S. said that incidents of verbal abuse like this occurred more than twice per week (*id.* at 73:8–9), and described other similar incidents that caused F.S. and I.S. to cry (*id.* at 75:3–24). These incidents traumatized F.S. (*Id.* at 65:1.)

In June 2016, things in the house worsened when F.S.'s older sister[14] left the house, because F.S. and her older sister protected each other when "any violence or abuse" was going on. (*Id.* at 59:6–15.) The incident that ultimately led to F.S. moving out of her family's home and moving in with her maternal uncle, Marty Heimowitz, occurred at a wedding, during which Miriam cursed at many of her children, telling them that they should die. (*Id.* at 65:6–68:9.) The incident made F.S. feel horrible for weeks. (*Id.* 74:24–75:2.)

F.S. first ran away from her mother's house on September 4, 2016, when her mother "became violent," and F.S. fled to her older sister's house. (*Id.* at 76:19–77:6.) When F.S. left,

---

[14] F.S.'s older sister is not I.S. I.S. is F.S.'s younger brother.

she told her mother where she was going.  (*Id.* at 90:24–91:3.)  Her mother went to her sister's house and banged on the door, but F.S. and her sister hid inside.  (*Id.* at 90:15–23.)  The next morning, police came to her sister's house, saying F.S. was missing, even though her mother knew where she was.  (*Id.* at 91:9–13.)  Even though F.S. had a law guardian, Ms. Markowitz, the police pursued F.S. like this four or five times, which was "traumatizing and terrible."  (*Id.* at 91:21–92:7.)

F.S. testified that the uncle she was staying with before her "disappearance" (on February 1, 2017) had thrown her out.  (*Id.* at 108:9–10.)  Rather than being placed anywhere by ACS, however, F.S. spent two days at her sister's house, and then went to Sarah Rosenfeld's house of her own volition—which was where she wanted to remain.  (*Id.* at 108:3–109:10.)  ACS's first contact with F.S. after her "disappearance" was on February 13, 2017, when ACS interviewed her. (Petition, Dkt. 165-3, at ECF 6.)

For the two weeks prior to the February 15, 2017 hearing, F.S. did not go to school because she was scared that her mother would come and force her to go home with her.  (*Id.* at 101:13–16.)  Every time F.S. heard a knock on the door, she hid under the table, because she knew her mother could call the police and pick her up and force her to go to her mother's home.  (*Id.* at 102:4–14.)  F.S. had seen the *writ* and knew that her mother was trying to get her.  (*Id.* at 103:6–13.)  F.S. had been seeing her therapist, Defendant Bendet, weekly since November 2016, and wanted to continue seeing Bendet (*id.* at 68:16–25), but her mother was trying to prevent her from doing so (*id.* at 79:7–9).  F.S. testified that she wanted to finish school and live a normal life, without any verbal or emotional abuse.  (*Id.* at 82:1–12.)

At the conclusion of the hearing, Judge Gruebel ordered that F.S. would remain in the home of Sarah Rosenfeld until further order of the Court, but that I.S. would remain in Miriam's custody.

17

(*Id.* at 126:18–27:7.)  Judge Gruebel also issued temporary orders of protection, prohibiting both Miriam and Israel from contacting F.S., including through electronic communication or third-party contact.  (*Id.*.)  Those orders were memorialized in written orders issued that same day.  (Orders, Dkts. 157-4, 165-5.)

The following day, Miriam withdrew her opposition to the request for removal of F.S. and consented to the removal and temporary release of F.S. to Sarah Rosenfeld.  (Order, Dkt. 165-9.)  Accordingly, Judge Gruebel ordered that F.S. remain in the custody of Sarah Rosenfeld, to be removed only upon an order by the court, and reaffirmed that I.S. would remain in Miriam's custody.  (*Id.*)  That same day, February 16, 2017, Judge Thomas stayed the *habeas writ* against the numerous family members and Defendant Bendet, pending a March 14, 2017 hearing.  (Order, Dkt. 155-1 at ECF 89.)

### D. Resolution of Plaintiffs' February 2017 *Habeas* Proceeding as to F.S.

On June 9, 2017, Judge Thomas issued a lengthy decision in the habeas proceeding.  (Decision/Order, Dkt. 157-3.)  In it, Judge Thomas recounted that Sally Markowitz had been appointed as an attorney for both F.S. and I.S., that both parents had stipulated to F.S. living with her uncle Samuel Schlesinger in September 2016, that the parents had consented to F.S. being enrolled in therapy with Defendant Bendet, that Judge Gruebel had placed F.S. in the custody of Sarah Rosenfeld and issued orders of protection against Miriam and Israel, and that Miriam and Israel had subsequently consented to an order of removal.  (*Id.* at 2–4.)  Judge Thomas then summarized Miriam and Israel's arguments: that respondents had refused to disclose F.S.'s whereabouts to the NYPD and "conspired to brainwash, manipulate, coerce, force, persuade, restrain, trick, and bribe F.S. not to return home to the physical custody of Petitioner and that their conduct is physically and mentally detrimental to the child."  (*Id.* at 5.)  Judge Thomas denied Miriam and Israel's request for an order of protection and temporary restraining order against the

18

respondents, noting that such an order would be inconsistent with the family court's orders.  (*Id.* at 6.)  The court also denied the request for a *writ* of *habeas corpus*, noting that "it is more appropriate for the issue of custody and/or visitation with the subject child to bear out in the family court."  (*Id.* at 7.)

On December 22, 2017, Plaintiffs appealed the orders of protection issued against them by Judge Gruebel in the neglect proceeding to the New York Appellate Division.  (Notice of Appeal, Dkt. 165-17.)

### E.    Post-December 2017 Family Court Proceedings; Filing Injunction Against Plaintiffs

As part of the family court proceeding,[15] Judge Gruebel scheduled a permanency hearing. On January 9, 2018, Judge Gruebel noted that Miriam had decided to represent herself *pro se* in an upcoming permanency hearing, and thus submitted her own witness and exhibit list, which differed from the one submitted by her prior counsel, requiring the permanency hearing to be adjourned until February 13, 2018, and the fact-finding hearing to be adjourned until March 5, 2018.  (Order, Dkt. 165-11.)  That same day, the court issued an interim order of reasonable efforts,[16] making "an interim finding of reasonable efforts, and approv[ing] the goal prospectively

---

[15] Once a child is temporarily removed by ACS, a number of family court procedures are triggered, such as permanency hearings and fact-finding hearings.  At a permanency hearing, "the court determines the appropriateness of the agency's plan to create permanency for the child." N.Y. Courts, *Child Protective / Permanency Planning*, https://ww2.nycourts.gov/COURTS/nyc/family/childprotective.shtml (last visited Sept. 27, 2022).  A fact-finding hearing is "a hearing to determine whether the child is an abused or neglected child as defined by this article."  N.Y. Fam. Ct. Act § 1044.

[16] A temporary order of reasonable efforts is a finding by the judge that reasonable efforts were made, prior to the removal application, to prevent or eliminate the need for removal. *Nicholson v. Scoppetta*, 3 N.Y.3d 357, 379–80 (2004).

of return to parent."  (Order, Dkt. 165-12.)  Plaintiffs appealed the interim order of reasonable

efforts to the New York Appellate Division the same day.  (Notice of Appeal, Dkt. 165-16.)

On March 5, 2018, Judge Gruebel ruled on Plaintiffs' motions (1) for the return of F.S.,

(2) for contempt orders against anyone preventing the return of F.S. in violation of the *writ* of

*habeas corpus*, and (3) to compel the testimony of Defendants Semexant, Cyrus, and Best.  (Order,

Dkt. 165-13.)  Judge Gruebel: (1) denied the motion to return F.S. under *res judicata*; (2) denied

the contempt motion, noting that the initially ordered *writ* had been superseded by subsequent

family court orders and that the court had already rejected Miriam's argument that she had only

consented to removal as a result of coercion; and (3) granted the motion to compel the testimony

of Defendant Semexant, which was unopposed by ACS, but denied without prejudice the

application seeking to compel the appearance of Cyrus and Best finding them to be irrelevant to

the proceeding.  (*Id.*)

On April 3, 2018, Plaintiffs filed an Order to Show Cause with the New York Supreme

Court, demanding that Judge Gruebel and others show cause why: (1) F.S. should not be returned

to Plaintiffs; (2) the orders of protections should not be vacated; (3) sanctions should not be issued

for kidnapping and interference with custody; and (4) Judge Gruebel should not be subjected to a

psychological evaluation.  Plaintiffs also sought an order stating that the initial *habeas writs* were

still in effect.  (Order to Show Cause, Dkt. 157-5.)  Plaintiffs' show-cause request was denied for

lack of jurisdiction without prejudice to Plaintiffs properly filing an Article 78 proceedings.  (*Id.*

at 5.)

On May 1, 2018, Judge Gruebel issued a filing injunction against Plaintiffs, noting that

they had filed "innumerable motions," all of which the court had ruled on, but which demonstrated

a "pattern of behavior . . . [of] misusing the Court process."  (Order, Dkt. 165-14.)  The court thus

required that all future motions filed by Plaintiffs be immediately placed on the court's calendar that day; that the movant would then be required to appear in court, provide proof, and make argument; that the court would issue a written decision on the issue; and that the decision and transcript of the hearing would be made available to the parties. (*Id.*) On May 11, 2018, Plaintiffs were granted leave to appeal that order and the orders of protection issued in the neglect proceeding. (Order, Dkt. 165-15.)

Over the next two years, extensive family court proceedings ensued, including:

- On May 18, 2018, Judge Gruebel denied Plaintiffs' motion to remove F.S. from Sarah Rosenfeld's custody, denied a motion for contempt against the King County Mental Health Clinic, and granted a motion requiring Defendant Bendet to testify as part of the fact-finding in the family court proceeding. (Order, Dkt. 155-1 at ECF 99–102.)

- On June 10, 2018, Plaintiffs subpoenaed records from numerous individuals as part of the family court proceeding. (Subpoenas, Dkts. 155-1 at ECF 103–07.)

- On June 25, 2018, Judge Gruebel held a hearing at which testimony was taken from Miriam and Defendant Bendet, both of whom were subject to cross-examination. (Transcript, Dkt. 165-18.)

- On June 27, 2018, the Appellate Division denied leave to appeal certain decisions by Judge Gruebel. (Order, Dkt. 157-8.)

- On July 10, 2018, Judge Gruebel ordered payment of Defendant Markowitz for her service as court-appointed attorney to F.S. and I.S. (Order, Dkt. 153-6.)

- On July 13, 2018, a New York Supreme Court Justice denied Plaintiffs' request for a *writ* of *mandamus* ordering ACS to grant Plaintiff's visitation rights with F.S. (Order, Dkt. 157-6.)

- On August 15, 2018, Judge Gruebel granted an order requested by Defendant Markowitz, requiring Plaintiffs to show cause why F.S.'s mental health records should not remain confidential or, in the alternative, be reviewed *in camera* to determine their relevance to the family court proceedings. (Order, Dkt. 155-1, at ECF 108–13.)

- On September 18, 2018, the Appellate Division granted Plaintiffs an extension to perfect one of their appeals. (Order, Dkt. 157-9.)

- On September 26, 2018, New York Supreme Court Justice Debra Silber dismissed for failure to state a claim a case brought by Plaintiffs against Defendant Bendet for "alleged abuse of process, intentional infliction of emotional distress, fraud, fraudulent misrepresentation, prima facie tort, and conspiracy to commit tort." (Decision/Order, Dkt. 155-1, at ECF 114–20.)  Justice Silber specifically held that "the conduct alleged in the complaint is not the sort of extreme and outrageous conduct required to state . . . a claim [for intentional infliction of emotional distress]."  (*Id.* at ECF 117.)  Judge Silber also noted that Defendant Bendet had been appointed by the court, and "continued to be the child's therapist in conjunction with the currently pending neglect proceeding against the parents in Kings County family court."  (*Id.* at ECF 116.)[17]

- On October 2, 2018, Judge Gruebel issued a decision on the disclosure of F.S.'s therapy, which, after the judge's *in camera* review, resulted in the production of only those records relevant to the proceeding.  (Order, Dkt. 155-1 at ECF 123–25.)  The court observed that, at that juncture, the child-protective proceeding was in "mid fact-finding," and fact-finding would continue on October 9, 2018, with further testimony from Miriam and Israel.  (*Id.* at 123–26.)

- On October 22, 2018, Plaintiffs moved for leave to appeal Judge Silber's September 26, 2018 order dismissing Plaintiffs' action against Defendant Bendet.  (Notice of Appeal, Dkt. 155-1, at ECF 130–41.)

- On May 28, 2019, the Appellate Division dismissed Plaintiffs' appeal for failure to meet the extended deadline by which to perfect the appeal.  (Decision & Order, Dkt. 157-11.)

- On December 11, 2019, the Appellate Division issued another decision in the family court case, dismissing several of Plaintiff's motions about orders of protection.  (Decision & Order, Dkt. 157-7, at 2.)  The appeals court also upheld Judge Gruebel's filing injunction against Plaintiffs, noting that "the record reflects that the mother and the father forfeited [their right to free access to the courts] by abusing the judicial process through vexatious litigation."  (*Id.*[18])

---

[17] On September 12, 2019, Judge Silber granted permission for Defendant Bendet to obtain a certified copy of her September 26, 2018 Order to submit to this Court in this proceeding.  (Order, Dkt. 155, at ECF 121–22.)

[18] In its prior decision in this case, the Second Circuit stated that "[t]his case does not involve a vexatious litigant."  *Schvimmer*, 857 F. App'x at 672.  The Second Circuit, however, did not have the benefit of reviewing the full record before the New York Appellate Division when it made that statement.

In May 2020—over a year after the initial complaint was filed in this case—F.S. became a legal adult, and thus the neglect proceeding became moot.

## STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Vengalattore v. Cornell Univ.*, 36 F.4th 87, 102 (2d Cir. 2022) (quoting *Lynch v. City of New York*, 952 F.3d 67, 74 (2d Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009))).  A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Iqbal*, 556 U.S. at 678).  The plausibility standard under Rule 12(b)(6) requires "more than a sheer possibility that a defendant has acted unlawfully," and determining whether a complaint meets this standard is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*  (quoting *Iqbal*, 556 U.S. at 678–79).

For purposes of this analysis, the Court "accept[s] as true all factual allegations and draw[s] from them all reasonable inferences; but [is] not required to credit conclusory allegations or legal conclusions couched as factual allegations." *Hamilton v. Westchester Cnty.*, 3 F.4th 86, 90–91 (2d Cir. 2021) (quoting *Dane v. UnitedHealthcare Ins. Co.*, 974 F.3d 183, 188 (2d Cir. 2020). Furthermore, "a court need not feel constrained to accept as truth conflicting pleadings that make no sense, or that would render a claim incoherent, or that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely, or by facts of which the court may take judicial notice." *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 405–06 (S.D.N.Y. 2001) (citing *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1095 (2d Cir. 1995)). Finally, "[a] court may dismiss a claim as 'factually frivolous' if the sufficiently well-pleaded facts

are 'clearly baseless'—that is, if they are 'fanciful,' 'fantastic,' or 'delusional.'" *Gallop v. Cheney*, 642 F.3d 364, 368 (2d Cir. 2011) (quoting *Denton v. Hernandez*, 504 U.S. 25, 32–33 (1992)).[19]

## DISCUSSION

All of Plaintiffs' claims must be dismissed as to all Defendants. Plaintiffs have failed to plausibly allege any of the claims they assert, even when considering the allegations as a whole, as opposed to considering the allegations made against each Defendant. The Court addresses each of Plaintiffs' claims as alleged.

## I.   The Court's Consideration of State Court Records

On a motion to dismiss, the Court is generally limited to considering the allegations in the complaint. *Hamilton*, 3 F.4th at 90–91 (2d Cir. 2021). However, courts may also consider "extrinsic material that the complaint incorporates by reference, that is 'integral' to the complaint, or of which courts can take judicial notice." *Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 305 (2d Cir. 2021) (internal quotation marks omitted). "[W]hen a court relies upon extrinsic materials considered integral to the complaint, it must be clear on the record that no dispute exists regarding the accuracy of the document." *Goe v. Zucker*, 43 F.4th 19, 29 (2d Cir. 2022) (ellipsis omitted). When considering factual findings made in state proceedings, the Court should not "rule on the factual accuracy of those materials," but may cite to them "to explain the decision-making of state authorities." *Id.*

---

[19] Although Defendants also move for dismissal for lack of jurisdiction under Rule 12(b)(1), because the Court finds that dismissal is warranted under Rule 12(b)(6), it does not address Defendants' arguments about the lack of subject matter jurisdiction under doctrines such as *Rooker-Feldman* and the domestic relations abstention doctrine. The Court also does not address Defendants' arguments about impermissible group pleading, insufficient allegations as to individual defendants, and various immunities.

Here, Plaintiffs' SAC extensively attacks the procedures of the state court proceedings, citing numerous orders of the state courts, complaining about not being able to file appeals and other documents, asserting that action taken by the State was not based on sufficient evidence, and claiming various state court hearings were unfair for numerous reasons. The Court thus finds that those records are integral to the complaint. *Sevilla v. Perez*, No. 15-CV-3528 (KAM) (LB), 2016 WL 5372792, at *3 & n.10 (E.D.N.Y. Sept. 26, 2016) (finding, in a similar case, that "the court orders and hearing transcripts from the underlying Family Court proceedings" were integral to the complaint (quoting *Villanueva v. City of New York*, No. 08-CV-8793 (LBS), 2010 WL 1654162, at *5 (S.D.N.Y. Apr. 14, 2010) (citing *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir.1991)))).

Plaintiffs do not contest the accuracy of any of those documents; they merely take issue with the findings expressed in them. Accordingly, the Court finds that it may consider the state court documents and their contents "to explain the decision-making of state authorities" that Plaintiffs are challenging. *Goe*, 43 F.4th at 29.

## II.   Plaintiff's Claims

### A.    Count One: Fourth Amendment Claim

Plaintiffs assert that F.S. was unreasonably seized during the "pre-petition removal" (*see* SAC, Dkt. 106, ¶ 200), referring to the two-week period between the date of F.S.'s "disappearance" on February 1, 2017 and the date of Judge Gruebel's order placing F.S. with Sarah Rosenfeld on February 15, 2017 (*see id.* ¶ 5; Order, Dkt. 157-4).

Plaintiffs are correct that removal of a child from her home without a valid court order or parental consent could violate the Fourth Amendment. "When a child is taken into state custody, his or her person is 'seized' for Fourth Amendment purposes. The child may therefore assert a claim under the Fourth Amendment that the seizure of his or her person was 'unreasonable.'"

*Southerland v. City of New York*, 680 F.3d 127, 143 (2d Cir. 2012); *see also Tenenbaum v. Williams*, 193 F.3d 581, 602 (2d Cir. 1999); *Smith v. Tkach*, 844 F. App'x 414, 416 (2d Cir. 2021) (summary order) (presumption of probable cause attaches after a court order authorizing removal is issued).

"A Fourth Amendment child-seizure claim," however, "belongs only to the child, not to the parent, although a parent has standing to assert it on the child's behalf." *Southerland*, 680 F.3d at 143.   Furthermore,

> where information possessed by a state officer would warrant a person of reasonable caution in the belief that a child is subject to the danger of abuse if not removed . . . before court authorization can reasonably be obtained, the 'exigent circumstances' doctrine permits removal of the child without a warrant equivalent and without parental consent.

*Id.* at 158 (ellipsis omitted).[20]

To be sure, Plaintiffs allege that, before obtaining a court order, "ACS located F.S. at the home of a relative, Sarah Rosenfeld."  (Compl., Dkt. 106, ¶¶ 90, 94.)  Based on this allegation,

---

[20] In its prior decision in this case, the Second Circuit noted that (1) "parents may assert [Fourth Amendment] claims on their children's behalf," (2) "[t]o establish that a seizure violated the Fourth Amendment, a plaintiff must show that the seizure was unreasonable—i.e., that it was not supported by probable cause," and (3) a state official may take custody of a child without parental consent or a court order "[o]nly in emergency circumstances in which a child is immediately threatened with harm."  *Schvimmer*, 857 F. App'x at 672 (internal quotation marks and brackets omitted).

Plaintiffs vehemently argue that this claim and their procedural due process claim may not be dismissed under the "law of the case" doctrine because of the Second Circuit's prior decision in this case.  That decision, however, did not state that either claim had been alleged plausibly enough to survive a motion to dismiss, but said that "[t]he Schvimmers' pleadings and motion papers in the district court suggest that at least some claims would have been properly stated if leave to amend had been granted."  *Schvimmer*, 857 F. App'x at 672.  That Second Amended Complaint—which fully displaces the prior complaint—is now before the Court, and the Court finds that it does not plausibly allege any of the asserted causes of action.

Plaintiffs assert that F.S. was taken into state custody and a seizure was effected, giving rise to a Fourth Amendment claim.[21]  *Southerland*, 680 F.3d at 143.

In light of the extensive state court record, however—particularly F.S.'s own testimony at the neglect proceeding—it does not actually appear that F.S. was taken into state custody and, even if she was, Plaintiffs cannot plausibly allege a non-frivolous claim—especially on F.S.'s behalf—that placing F.S. with Sarah Rosenfeld was unreasonable.  *Vengalattore*, 36 F.4th 87, 102 (the plausibility standard requires "the reviewing court to draw on its judicial experience and common sense" (quoting *Iqbal*, 556 U.S. at 678–79)); *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d at 405–06 (the Court need not accept allegations that conflict with records of which the Court may take judicial notice); *Gallop*, 642 F.3d at 368 ("A court may dismiss a claim as 'factually frivolous' if the sufficiently well-pleaded facts are 'clearly baseless'—that is, if they are 'fanciful,' 'fantastic,' or 'delusional.'" (quoting *Denton*, 504 U.S. at 32–33)).

In general, the Court may consider "the court orders and hearing transcripts from the underlying Family Court proceedings."  *Sevilla*, 2016 WL 5372792, at *3.  The Court believes that this principle applies with particular force in this case to permit the Court to consider the in-court, sworn testimony that F.S. gave contemporaneously with the alleged seizure, since the Fourth Amendment claim at issue belongs to F.S., not to Plaintiffs.  *Southerland*, 680 F.3d at 143.

As a preliminary matter, it is not clear to the Court that—now that F.S. is an adult—Plaintiffs should be able to maintain a Fourth Amendment claim on F.S.'s behalf, at all.  Although "standing is to be determined as of the commencement of suit," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 571 n.5 (1992), child-seizure claims present an interesting question.  Because the claim

---

[21] The Court assumes without deciding that ACS placing F.S. with Sarah Rosenfeld would have been the functional equivalent of ACS taking F.S. into state custody.

belongs to the child, not the parent, *Southerland*, 680 F.3d at 143, the parents themselves have no cognizable injury.  Accordingly, the Court sees no reason why, after the child is no longer a minor, the parent should be able to maintain the claim on the now-adult child's behalf—even if the claim is for past damages.  The claim—and the past damages—belong to the now-adult child, not the parent.[22]  Supreme Court and Second Circuit precedent on the Fourth Amendment would seem to suggest that parents cannot continue to pursue such litigation.  *Tenenbaum*, 193 F.3d at 601 n.13 ("Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." (quoting *Alderman v. United States*, 394 U.S. 165, 174 (1969)).

Even assuming *arguendo*, however, that Plaintiffs may continue to maintain this Fourth Amendment claim, the state court record, particularly F.S.'s testimony, indicate that F.S. was not taken into state custody, and that, even if she was—by virtue of being placed with Sarah Rosenfeld—such placement were not unreasonable because "information possessed by a state officer . . . warrant[ed] a person of reasonable caution in the belief that [F.S. was] subject to the danger of abuse if not removed" from Plaintiffs' home.  *See Southerland*, 680 F.3d at 158.

On the issue of whether F.S. was actually taken into state custody, the Court notes that F.S. testified that, after leaving her uncle's house on February 1, 2017, F.S. first went to her sister's

---

[22] Plaintiffs also appear to assert that they have their own, free-standing Fourth Amendment claim based on F.S.'s alleged seizure.  (SAC, Dkt. ¶ 209.)  That assertion, however, is incorrect.  As noted, "[a] Fourth Amendment child-seizure claim belongs only to the child, not to the parent, although a parent has standing to assert it on the child's behalf."  *Southerland*, 680 F.3d at 143.

Additionally, although some of Plaintiffs' allegations appear to allege a seizure of I.S. (*see, e.g.*, FAC, Dkt. 106, ¶¶ 1 & n.2, 11, 13, 16, 138, 140), there is no mention of I.S. in Plaintiffs' Fourth Amendment claim in Count One.  (*See* FAC, Dkt. 106, ¶¶ 186–212.)  In any event, the allegations regarding I.S. are too conclusory to state a Fourth Amendment claim.  The state court record reveals that I.S. remained in Plaintiffs' custody throughout the state court proceedings, and specifically during the period of time focused on by the Fourth Amendment claim—from February 1, 2017 to February 15, 2017, when the custody orders relating to both F.S. and I.S. were entered. (*See, e.g.*, Order, Dkt. 165-9 (ordering that I.S. would *remain* in Plaintiffs' custody).)

house, then went to Sarah Rosenfeld's house on her own volition, actually hiding to avoid any intervention by state authorities—whom she thought would return her to her mother—and that F.S.'s first contact with ACS after her "disappearance" was not until February 13, 2017, when ACS interviewed her. (Tr., Dkt. 165-6, 101:13–16, 102:4–14, 108:3–109:10; Petition, Dkt. 165-3, at ECF 6.) It thus appears that ACS had no contact with F.S. during almost the entire "pre-petition period," *i.e.*, February 1–13, 2017, and did not place F.S. with Sarah Rosenfeld. Thus, there is no factual allegation upon which to plausibly infer that F.S. was ever taken into state custody. Indeed, the SAC does not contain any non-conclusory allegations about ACS placing F.S. at Rosenfeld's home. At most, to the extent ACS allowed F.S. to remain at Rosenfeld's home for the two days before the February 15, 2017 hearing in the neglect proceeding, that action (or inaction) might be deemed a "placement."

Furthermore, even if F.S. was taken into state custody by ACS during that period of time, the record makes it abundantly clear that ACS possessed "information . . . [that] would warrant a person of reasonable caution in the belief that [F.S. was] subject to the danger of abuse if not removed" from Plaintiffs' custody, and thus F.S.'s placement with Sarah Rosenfeld was not unreasonable. *See Southerland*, 680 F.3d at 158.

When Defendant Best, an ACS worker, interviewed F.S. on February 13, 2017, F.S. told Best that she had fled the family home in September 2016 because of violence, including Miriam throwing bottles at F.S., and her mother hitting her father with a belt. (Petition, Dkt. 165-3, at ECF 6.) F.S. also described an incident at a wedding where her mother followed her around calling her bi-polar, and told investigator Best that she had not attended school over the prior two weeks because she was afraid that her mother would come to school and take her. (*Id.*) During the interview, Best observed F.S. "crying, shaking and breathing heavy almost to the point of

hyperventilating when discussing returning to the respondents['] home or even visiting with respondents." (*Id.*)  During F.S.'s in-court testimony two days later, she once again described these incidents of violence, occasionally breaking down in tears, and provided even more harrowing details about her relationship and living with her mother.[23]  (*See supra* pages 15–17 (summarizing F.S.'s removal hearing testimony).)  Accordingly, any "placement" of F.S. with Sarah Rosenfeld would have been reasonable, and thus not a Fourth Amendment violation.

For all of the reasons explained above, Plaintiffs have no viable Fourth Amendment claim, and this claim must be dismissed as to all Defendants.

## B.     Count Two: Procedural Due Process Claim

Plaintiffs cannot plausibly allege a procedural due process claim.  "As a general rule[,] before parents may be deprived of the care, custody, or management of their children without their consent, due process—ordinarily a court proceeding resulting in an order permitting removal— must be accorded to them."  *Southerland*, 680 F.3d at 149.  Plaintiffs allege a procedural due process claim as to (1) the adjournment of the fact-finding hearing, and (2) the OCA Defendants allegedly attempting to prevent them from filing documents.  (Compl., Dkt. 106, ¶¶ 235, 241.) The latter is better characterized as an access to the courts claim, and is thus discussed below.

Regarding the adjournments of the fact-finding hearing, in its prior decision, the Second Circuit stated that

> [t]he amended complaint and Miriam Schvimmer's affidavit allege that she and her husband have been repeatedly denied opportunities for full hearings to determine the factual issues of whether they were fit parents and whether their daughter faced danger in their household, were not permitted to present their expert testimony or other evidence at the limited hearings that did occur, and often received no notice

---

[23] Although the caseworkers who "placed" F.S. with Sarah Rosenfeld would not have had full access to F.S.'s hearing testimony prior to allowing F.S. to remain with Rosenfeld between February 13–15, 2017, F.S.'s testimony makes it clear that the critical facts were relayed to the caseworker, *e.g.*, Defendant Best, prior to the placement.

of those hearings, which permitted ACS officials to obtain nineteen ex parte orders that extended the order of protection. The complaint therefore indicates that the Schvimmers were denied judicial process before an order of protection was entered or extended.

*Schvimmer*, 857 F. App'x at 672–73.

However, the state court record now before this Court undermines all of the facts relied on by the Second Circuit and demonstrates that Plaintiffs cannot plausibly allege a procedural due process violation. *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d at 405–06 (the Court need not accept allegations that conflict with records of which the Court may take judicial notice). The mere fact of the two-years' worth of discovery, hearings, decisions, and procedural mechanisms utilized by Plaintiffs—not to mention their substance—demonstrate that Plaintiffs were provided with more than adequate procedural due process.

The first state court order placing F.S. with Sarah Rosenfeld—her paternal aunt—was issued after an extensive hearing, at which F.S. testified and was subjected to thorough and rigorous cross-examination, and which provided Judge Gruebel with ample evidence to find that F.S. should not be returned to the marital home. (*See generally* Tr., Dkt. 165-6.) Indeed, Judge Gruebel also issued restraining orders against Israel and Miriam, preventing them from contacting F.S., to protect the child's wellbeing. (*Id.* at 126:15–27:7; Orders, Dkt. 165-5.) The next day, Plaintiffs withdrew their opposition to the removal and consented to placement of F.S. with Sarah Rosenfeld. (Order, Dkt. 165-9.)

From that day forward, Plaintiffs persistently accessed the courts to attempt to regain custody of F.S. Their requests were promptly addressed by the family court and Appellate Division in written orders. Though Plaintiffs failed in their efforts to regain custody of F.S., they were not denied any process. Among other things, Plaintiffs' motion to compel Defendant Semexant to testify was granted (Order, Dkt. 165-13); Plaintiffs subpoenaed various records

(Subpoenas, Dkts. 155-1 at ECF 103–07); Miriam testified as part of the fact-finding proceedings before Judge Gruebel (Transcript, Dkt. 165-18); Plaintiffs appealed numerous decisions to the Appellate Division, some of which were ruled on on the merits (*see, e.g.*, Decision & Order, Dkt. 157-7); Plaintiffs were granted extensions for appellate briefing (*see* Decision & Order, Dkt. 157-11); and Plaintiffs were able to file collateral attacks challenging the family court decisions, which were ultimately denied (*see, e.g.*, Order, Dkt. 157-6).  Furthermore, even the filing injunction that was issued against Plaintiffs did not actually limit their access to the courts, but required them to present proof at the time of filing.  If anything, though styled as a filing injunction, that order effectively granted Plaintiffs greater access to the courts by placing their motions on the calendar the day they were filed and guaranteeing them access to written decisions and transcripts.  (Order, Dkt. 165-14.)  Indeed, the sheer volume of litigation that Plaintiffs generated over the two-year period—of which the Court may take judicial notice, *Goe*, 43 F.4th at 29—alone debunks any notion that the filing injunction deprived Plaintiffs of, or delayed, any process.

In light of ample state court record, it is clear that Plaintiffs were not denied procedural due process and therefore cannot plausibly allege a procedural due process claim.  Accordingly, this claim must be dismissed as to all Defendants.

### C.    Count Three: Substantive Due Process Claim

Plaintiffs allege a substantive due process violation based on the fact that parents "have a constitutionally protected liberty interest in the care, custody and management of their children." (SAC, Dkt. 106, ¶ 245 (internal quotation marks omitted).)  To demonstrate such a substantive due process violation, "[t]he interference with the plaintiff's protected right must be so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it even were it accompanied by full procedural protection."  *Southerland*, 680 F.3d at 152 (internal quotation marks omitted).  "Thus, in the child-removal context, [courts] ask whether the removal would have

been prohibited by the Constitution even had the plaintiffs been given all the procedural protections to which they were entitled." *Id.* (internal quotation marks, brackets, and ellipsis omitted).

Plaintiffs appear to assert a substantive due process claim for the entire period between F.S.'s "disappearance" on February 1, 2017 and the day she achieved the age of majority in May 2020. (Compl., Dkt. 106, ¶ 259.)  As an initial matter, even to the extent that ACS could be deemed to have placed F.S. in Sarah Rosenfeld's home two days before Judge Gruebel issued her first removal order on February 15, 2017, that brief "placement" cannot support a substantive due process claim.  "Brief removals of a child 'generally do not rise to the level of a substantive due process violation . . . ." *Schweitzer v. Crofton*, 935 F. Supp. 2d 527, 549 (E.D.N.Y. 2013) (collecting cases for proposition that six-day pre-petition removal was not a substantive due process violation as a matter of law) (quoting *Southerland*, 680 F.3d at 153), *aff'd*, 560 F. App'x 6 (2d Cir. 2014) (summary order).

Furthermore, in assessing whether a substantive due process violation has been plausibly alleged, the Court must balance Plaintiffs' right to family integrity against the "compelling governmental interest in the protection of minor children, particularly in circumstances where the protection is considered necessary as against the parents themselves" and provide "unusual deference" to the ACS caseworker's decisions.  *Southerland*, 680 F.3d at 152.  In doing so, the Court may again take judicial notice of the family court records, *Sevilla*, 2016 WL 5372792, at *3; *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d at 405–06 (the Court need not accept allegations that conflict with records of which the Court may take judicial notice), which indicate that, when F.S. was initially interviewed about being returned to the custody of her parents, or even visiting with them, she started "crying, shaking and breathing heavy almost to the point of

33

hyperventilating" (Petition, Dkt. 165-3, at ECF 6). Indeed, ACS filed the neglect petition the very next day, February 14, 2015, which attests to ACS's belief that allowing F.S. to remain in Rosenfeld's home until the hearing the next day was necessary for her protection—a decision affirmed by Judge Gruebel at the hearing. Because the state had an exceedingly strong interest in protecting F.S. from Israel and Miriam, Plaintiffs cannot plausibly allege a substantive due process violation based on the brief pre-petition "placement." *See Southerland*, 680 F.3d at 152. Furthermore, F.S.'s own testimony demonstrates that her pre-petition removal was not "so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it even were it accompanied by full procedural protection." *Id.*; (*see supra* pages 15–17 (summarizing F.S.'s removal hearing testimony)).

For the period of time after the family court proceedings commenced, all of Plaintiffs' allegations are "clearly challenges to the sufficiency of the procedures provided by the family court"—which this Court has found sufficient—"and not the deprivation of [Plaintiffs'] substantive due process rights." *Schweitzer* , 935 F. Supp. at 550.[24] Accordingly, Plaintiffs' substantive due process claim must be dismissed as to all Defendants.

### D. Count Four: Family Integrity Claim

Plaintiffs' fourth count alleges a violation of Plaintiffs' right to "family integrity" (SAC, Dkt. 106, ¶ 280) under a *Monell* theory of liability (*id.* ¶ 264) against two ACS supervisors,

---

[24] Furthermore, even if the Court were to consider Plaintiffs' allegations challenging the state court order of removal under the substantive due process standard, Plaintiffs would fail to state a claim. The Court would take judicial notice of the initial hearing in the family court proceeding, in which F.S. described witnessing extensive violence between her parents, and being subjected to "a lot" of physical violence herself. (*See* Tr., Dkt. 165-6, at 56:10–60:7.) She even testified that her mother had threatened her at a court proceeding. (*Id.* at 79–80.) In light of that testimony, the family court would have had an exceedingly strong interest in protecting F.S. from Israel and Miriam, and thus Plaintiffs could not plausibly allege a substantive due process violation. *See Southerland*, 680 F.3d at 152.

Defendants Hansell and Adejobi (*id.* ¶¶ 279–280).  This claim is thus based on the family integrity substantive due process claim alleged in Count Three, but brought under a theory of either municipal or supervisory liability.  Frankly, it is unclear if this claim is trying to assert *Monell* or supervisory liability.  While the first paragraph of the claim specifically cites *Monell* (*id.* ¶ 264), the remainder of the claim focuses on the culpability of two supervisors, rather than a municipal policy or custom, as required to establish *Monell* liability (*id.* ¶¶ 279–80).  Even though *Monell* claims can be brought based on the personal involvement of a decision-maker in the allegedly unconstitutional conduct, *Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008) (a single unconstitutional act or decision, when taken by an authorized decision-maker, may be considered a policy and thus subject a municipality to liability), Plaintiffs offer no allegations about Defendants Hansell and Adejobi possessing such decision-making authority.

In any event, this count must be dismissed because, as discussed above, Plaintiffs have not adequately alleged an underlying constitutional violation and thus cannot maintain a claim under municipal or supervisory liability.  *Anilao v. Spota*, 27 F.4th 855, 874 (2d Cir. 2022) ("[A] Monell claim cannot succeed without an independent constitutional violation."); *Blyden v. Mancusi*, 186 F.3d 252, 265 (2d Cir. 1999) ("Of course, for a supervisor to be liable under Section 1983, there must have been an underlying constitutional deprivation.").  Accordingly, Count Four must be dismissed as to all Defendants.

### E.   Count Five: Access to the Courts Claim

Plaintiffs' access to the courts claim appears to be limited to the OCA staff employees who Plaintiffs allege helped other Defendants "judge-shop," called security on them, locked doors, refused to accept Plaintiffs' papers, and "subjected them to ridicule by belittling their heritage in the hope that the humiliation and embarrassment would dissuade the Plaintiffs from filing their papers, or coming again to the Clerk's office."  (SAC, Dkt. 106, ¶¶ 292–96.)

While there is no "doubt that hostile action toward a litigant could be so offensive as to effectively drive the litigant out of a courthouse and thereby become the functional equivalent of a denial of access," a plaintiff must suffer actual prejudice to have a valid denial of access to the courts claim. *Monsky v. Moraghan*, 127 F.3d 243, 247 (2d Cir. 1997); *Oliva v. Town of Greece*, 630 F. App'x 43, 45 (2d Cir. 2015) (summary order) ("To succeed on an access to courts claim, a plaintiff must show that the defendant caused the plaintiff injury or, put less succinctly, that the defendant took or was responsible for actions that *had the actual effect* of frustrating the plaintiff's effort to pursue a legal claim." (emphasis added) (collecting Second Circuit and Supreme Court cases)).

Here, Plaintiffs' allegations are telling.  Plaintiffs allege only that the OCA employees acted "in the hope that" Plaintiffs would be dissuaded from filing papers and returning to the Clerk's office (SAC, Dkt. 106, ¶ 293), but do not allege that they were actually dissuaded.  Indeed, Plaintiffs' allegations and the substantial state court record demonstrate that Plaintiffs continued accessing the courts despite the OCA employees' alleged actions, filing "innumerable" motions, seeking a *writ* of *mandamus* and Article 78 review, and appealing many of the family court orders to the Appellate Division.  (*See, e.g.*, Order, Dkt. 165-14; Order, Dkt. 157-6; Order to Show Cause, Dkt. 157-5; Notice of Appeal, Dkt. 165-17; Notice of Appeal, Dkt. 165-16.)  Thus, Plaintiffs simply fail to allege any cognizable injury as a result of the OCA Defendants' conduct.

Accordingly, Plaintiffs' access to the Court claim must be dismissed as to all Defendants.

### F.    Count Six: Conspiracy to Violate Constitutional Rights Claim, Pursuant to 42 U.S.C. § 1983

Plaintiffs allege that all of the Defendants conspired to violate Plaintiffs' rights under the First Amendment (access to courts), Fourth Amendment (unreasonable seizure), Fifth and Fourteenth Amendments (due process) and Fifth and Fourteenth Amendments (family integrity),

in violation of § 1983.    However, Plaintiffs have not, and cannot, plausibly allege a § 1983 conspiracy claim.

"[A] plaintiff alleging a § 1983 conspiracy claim must prove an actual violation of constitutional rights."  *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995); *Oliver v. Penny*, No. 21-111, 2022 WL 2165814, at *3 (2d Cir. June 16, 2022) (§ 1983 conspiracy claim must be dismissed because plaintiff "did not plausibly allege an underlying constitutional violation.").  As discussed above, Plaintiffs have not adequately alleged the violation of any underlying constitutional right, and thus cannot maintain a § 1983 conspiracy claim.

Furthermore, Plaintiffs have not plausibly alleged an agreement to act in concert to inflict an unconstitutional injury, as required to state a § 1983 conspiracy claim.

> In order to survive a motion to dismiss on [a] § 1983 conspiracy claim, [plaintiff] must allege (1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages. . . . In addition, complaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed . . . .

*Ciambriello v. Cnty. of Naussau* , 292 F.3d 307, 324–25 (2d. Cir. 2002) (internal quotation marks omitted).

Here, all of Plaintiffs' allegations about an agreement to act in concert to inflict an unconstitutional injury are "conclusory" or "general allegations."  *See id.*; (SAC, Dkt. 106, ¶¶ 110, 113, 164, 252, 306, 308–09, 315–17, 345).  For example, Plaintiffs allege that "Defendant ACS, through Defendants Semexant, Adejobi, Francis, Fraser and the ACS Employees, [ ] secretly met and reached agreement with Defendants Jacobs, Katz, Markowitz and Bendet to frustrate, delay and thwart the Supreme Court writ, and prevent the child's return to her parents and keep her in Defendant ACS custody." (SAC, Dkt. 106, ¶ 110.)  Plaintiffs further claim, without any supporting factual allegation, that the purported agreement was motivated by these Defendants' desire to

"maximize . . . revenues" for ACS or themselves, and the fact that "Plaintiffs and their daughter were practicing Hasidic Jews who traditionally preferred to keep such matters within their own community." (*Id.* ¶112.)  Plaintiffs vaguely allege that these Defendants met and reached an agreement together "to provide false and misleading testimony and opinions in support of a[ removal] petition." (*Id.* ¶ 113.)  Perhaps Plaintiffs' most specific allegation is that, while Plaintiffs were in court for the *writ* of *habeas corpus*, all parties named in the writ were "gathered" in Defendant Jacobs's office.  (*Id.* ¶ 104.)  That allegation, however, does not even begin to plausibly allege an agreement to act in concert to inflict an unconstitutional injury.

Accordingly, Plaintiffs' § 1983 conspiracy claim must be dismissed as to all Defendants.

## G.   Count Seven: Conspiracy to Deprive Plaintiffs' Equal Protection Claim, Pursuant to 42 U.S.C. § 1985

Plaintiffs' § 1985 conspiracy claim also must be dismissed because Plaintiffs "do not plausibly allege an underlying constitutional violation." *Oliver*, 2022 WL 2165814, at *3; *Sherlock v. Montefiore Med. Ctr.*, 84 F.3d 522, 527 (2d Cir. 1996) ("The complaint failed to state a claim under § 1985(3) because, *inter alia*, that section creates no substantive rights but merely "provides a remedy for violation of the rights it designates . . . ." (quoting *Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 372  (1979))).

Further, Plaintiffs have not plausibly alleged a conspiracy under § 1985.  To state a claim under § 1985(3), a plaintiff must allege

> (1) a conspiracy (2) for the purpose of depriving a person or class of persons of the equal protection of the laws, or the equal privileges and immunities under the laws; (3) an overt act in furtherance of the conspiracy; and (4) an injury to the plaintiff's person or property, or a deprivation of a right or privilege of a citizen of the United States.

*Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir. 1999).  "A conspiracy need not be shown by proof of an explicit agreement but can be established by showing that the parties have a tacit

38

understanding to carry out the prohibited conduct." *Id.* (internal quotation marks omitted).  The conspiracy must be motivated by "some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action." *Id.* (*quoting Mian v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 7 F.3d 1085, 1088 (2d Cir. 1993)).  As discussed above, Plaintiffs have not plausibly alleged an agreement—even a tacit one—to violate Plaintiffs' civil rights.

Furthermore, even if Plaintiffs had plausibly alleged an agreement to act in concert to inflict an unconstitutional injury—which they have not—the Court would dismiss this claim because the allegations supporting it are "factually frivolous," "that is, . . . they are 'fanciful,' 'fantastic,' [and] 'delusional.'"  *Gallop*, 642 F.3d at 368.  To reiterate, Plaintiffs claim that there is a "larger conspiracy of ACS and its agents," including the Defendants, to "keep the ACS machine well-fed with vulnerable children to maximize its federal and state revenues," and that ACS specifically targets Hasidic Jewish children because "they know that there are customs and mores within that community that make it less likely for them to seriously challenge Defendant ACS actions than other groups."  (SAC, Dkt. 106, ¶ 114.)  Plaintiffs do not attempt to support these assertions with any factual allegations showing a pattern of ACS depriving individuals from the Hasidic Jewish community of equal protection of the law or treating them differently than people who are not members of the Hasidic Jewish community.  Without any evidence to ground this allegation, the claim of a large conspiracy across ACS and various private actors is not supported by facts, and thus, not sufficient to state a claim of conspiracy under 42 U.S.C. § 1985.

Accordingly, Plaintiffs' § 1985 conspiracy claim must be dismissed as to all Defendants.

**H.     Count Eight: Negligent Failure to Prevent Constitutional Violations Claim, Pursuant to 42. U.S.C. § 1986**

As with Plaintiffs' § 1983 and § 1985 conspiracy claims, Plaintiffs' § 1986 negligence claim must be dismissed because Plaintiffs "do not plausibly allege an underlying constitutional violation." *Oliver*, 2022 WL 2165814, at *3.

Plaintiffs' § 1986 claim also must be dismissed because they have not adequately alleged a § 1985 claim. Section 1986 provides in relevant part:

> Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented[.]

42 U.S.C. § 1986. Thus, Section 1986 explicitly requires an underlying conspiracy under Section 1985, which Plaintiffs have not sufficiently alleged. *See Brown v. City of Oneonta, New York*, 221 F.3d 329, 341 (2d Cir. 2000) ("[A] § 1986 claim must be predicated on a valid § 1985 claim.")

Accordingly, Plaintiffs' § 1986 negligence claim must be dismissed as to all Defendants.

**I.     Count Nine: Civil RICO Conspiracy Claim**

Plaintiffs do not have standing to bring a civil RICO claim. To bring this claim, a plaintiff must show three things: "(1) the defendant's violation of § 1962, (2) an injury to the plaintiff's business or property, and (3) causation of the injury by the defendant's violation." *Commercial Cleaning Servs., L.L.C. v. Colin Serv. Sys., Inc.*, 271 F.3d 374, 380 (2d Cir. 2001).

Here, Plaintiffs simply have not alleged an injury to their business or an injury to property, as defined under RICO. In the SAC, Plaintiffs claim that their injuries are a "loss of their constitutional rights, and grievous physical and emotional injury, embarrassment, financial damages, and pain and suffering to themselves and their family" because of the various threats that

40

were made to them by the Defendants.  (SAC, Dkt. 106, ¶ 359.)  In the context of civil RICO, however, a personal injury does not constitute damage to property.  *See Westchester Cnty Independence Party v. Astorino*, 137 F. Supp. 3d 586, 612 (S.D.N.Y. 2015) ("RICO only protects injury to the plaintiff's business or property, meaning that many injuries are insufficient to establish RICO standing.  Personal damages, emotional damages, and physical damages, for example, are insufficient."); *see also Tsipouras v. W & M Props., Inc.*, 9 F. Supp. 2d 365, 368 (S.D.N.Y. 1998) ("[M]ere injury to character, business reputation, and/or the intentional infliction of emotional distress are not actionable under civil RICO.").

Furthermore, even if Plaintiffs had standing to bring this claim, based on the factually unsupported "Child Abduction Enterprise" allegations, would be dismissed as factually frivolous.  *Gallop*, 642 F.3d at 368 ("A court may dismiss a claim as 'factually frivolous' if the sufficiently well-pleaded facts are 'clearly baseless'—that is, if they are 'fanciful,' 'fantastic,' or 'delusional.'" (quoting *Denton*, 504 U.S. at 32–33))

Accordingly, Plaintiffs' RICO claim must be dismissed as to all Defendants.

### J.     Count Ten: Intentional / Negligent Infliction of Emotional Distress Claim

Plaintiffs allege intentional or negligent infliction of emotional distress based on various Defendants' participation in both the "investigation and prehearing removal [of F.S.]" and the "child abuse and neglect proceedings."  (SAC, Dkt. 106, ¶ 361.)

To state an intentional or negligent infliction of emotional distress claim under New York law, a plaintiff must show that there has been "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress."  *Howell v. N.Y. Post Co.*, 81 N.Y.2d 115, 121 (1993).  Recovery can only be had when conduct is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be

regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 122 (quoting *Murphy v. Am. Home. Prods. Corp.*, 58 N.Y.2d 293, 303 (1983)).  The rule is said to be "rigorous[] and difficult to satisfy." *Id.*

Plaintiffs cannot plausibly allege that the "investigation and prehearing removal" was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.*  Once again, when F.S. was initially interviewed on February 13, 2017 by ACS about being returned to the custody of her parents, or even visiting with them, she started "crying, shaking and breathing heavy almost to the point of hyperventilating" (Petition, Dkt. 165-3, at ECF 6); at a hearing the next day, F.S. described, under oath, witnessing extensive violence between her parents, and being subjected to "a lot" of physical violence herself, and even testified that her mother had threatened her at another court proceeding (*see supra* pages 15–17 (summarizing F.S.'s removal hearing testimony)).  Accordingly, the removal of F.S. was entirely consistent with the "bounds of decency[,]" *Howell*, 81 N.Y.2d at 121, as well as ACS's duty under the law.

Plaintiffs also cannot plausibly allege an intentional or negligent infliction of emotional distress claim with respect to the "child abuse and neglect proceedings."  Above, the Court has thoroughly discussed the procedures available to and used by Plaintiffs throughout those proceedings, and they simply cannot be characterized as "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.*  And Plaintiffs' dissatisfaction with the outcome certainly is not evidence that they were improper in any way.  Accordingly, Plaintiffs' claims of intentional or negligent infliction of emotional distress must be dismissed as to all Defendants.

Furthermore, even if this claim was viable, which it is not, having dismissed all of Plaintiffs' federal claims, this Court would decline to exercise supplemental jurisdiction over this state law claim. *See Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) (citing 28 U.S.C. §§ 1367(a), (c)).

## III.   Motions to File Sur-Replies and to Hold Oral Arguments

While briefing of Defendants' motions was ongoing, various parties filed various motions to file sur-replies. (*See* Dkts. 173-1, 173-2, 173-3, 178.) All of those motions are granted. The Court has considered all of the arguments made in all of the briefing.

In addition, Plaintiffs requested oral argument on the present motions. (Dkt. 175.) In light of the extensive briefing and record before the Court on the present motions, the Court finds that oral argument is unnecessary. *Whitnum v. Town of Woodbridge*, 833 F. App'x 924, 925 (2d Cir. 2021) (summary order) ("[A] district court's decision whether to permit oral argument rests within its discretion and the extensive record evidence and submissions available in this case confirm that deciding the motion without oral argument was not an abuse of that discretion." (internal quotation marks omitted)); *Greene v. WCI Holdings Corp.*, 136 F.3d 313, 316 (2d Cir. 1998) ("[T]he decision whether or not to hold an oral hearing on a motion to dismiss lies in the sound discretion of the trial court."). Accordingly, Plaintiffs' request for oral argument is denied.

## IV.   Defendant Katz and the John and Jane Doe Defendants

Defendant Katz has not moved to dismiss the SAC. Katz is representing himself *pro se* in this matter. Nevertheless, he took steps to dismiss the First Amended Complaint against himself, and appeared at several conferences during that period of time. (*See, e.g.*, Dkts. 19, 80; 03/27/2019 Minute Entry; 07/30/2019 Minute Entry.) Since remand by the Second Circuit, however, Katz has failed to appear at conferences or otherwise engage in this litigation. (*See, e.g.*, 05/27/2021 Minute Entry; 08/24/2021 Minute Entry.) Nevertheless, because Plaintiffs have not plausibly alleged any

valid claim, the Court deems it appropriate to dismiss all of the claims as to all of the Defendants, including Defendant Katz.  It would be an exercise in futility to keep Defendant Katz in the case and allow Plaintiffs to move for default judgment, given that Plaintiffs have not plausibly alleged any cause of action, and thus any motion for default judgment would be denied.  *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 137 (2d Cir. 2011) ("[P]rior to entering default judgment, a district court is required to determine whether the plaintiff's allegations establish the defendant's liability as a matter of law." (internal quotation marks and brackets omitted)). Furthermore, because the Court has analyzed the claims against the John and Jane Doe Defendants, who are OCA employees, and found them lacking, the Court dismisses those unnamed Defendants, as well.

## V.   Amendment

Based on this Court's review of Plaintiffs' submissions, they have not sought leave to amend.  Even if they had, however, the Court would deny that request given the numerous opportunities that Plaintiffs have had to amend their complaint and because it is clear to the Court that any amendment would be futile.  *See TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014).

## CONCLUSION

For the reasons explained above, the motions to file sur-replies are granted; the motion for oral argument is denied; all of the motions to dismiss are granted; and all of Plaintiffs' claims are dismissed with prejudice against all of the Defendants, without leave to amend.  The Clerk of Court is respectfully directed to enter judgment accordingly.

SO ORDERED.


/s/ Pamela K. Chen
Pamela K. Chen
United States District Judge

Dated:  September 29, 2022
        Brooklyn, New York